[No. E021243. Fourth Dist., Div. Two. Aug. 30, 1999.]

VIRGIL BARHAM et al., Plaintiffs and Appellants, v.
SOUTHERN CALIFORNIA EDISON COMPANY, Defendant and
Appellant.

GTE CALIFORNIA INCORPORATED, Plaintiff and Respondent, v.
SOUTHERN CALIFORNIA EDISON COMPANY, Defendant and
Appellant.

DEPARTMENT OF FORESTRY AND FIRE PROTECTION, Plaintiff and
Respondent, v.
SOUTHERN CALIFORNIA EDISON COMPANY, Defendant and
Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part I.

**COUNSEL**

Law Offices of G. Greg Aftergood, G. Greg Aftergood; Reid & Hellyer and David C. Moore for Plaintiffs and Appellants.

William C. Falkenhainer; Dwyer, Daly, Brotzen & Bruno, Toni Rae Bruno and Douglas W. Schroeder for Defendant and Appellant.

Robert H. Wyman; Sottile & Taketa and Donn S. Taketa for Plaintiff and Respondent GTE California Incorporated.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Charles W. Getz IV, Assistant Attorney General, and Nam Yon Kim, Deputy Attorney General, for Plaintiff and Respondent California Department of Forestry and Fire Protection.

## OPINION

**RAMIREZ, P. J.**—This case involves a dispute regarding defendant Southern California Edison Company's (SCE) responsibility for damages sustained by the various plaintiffs as a result of a wildfire, commonly known as the Mill Creek fire, which broke out on October 27, 1993. The fire was alleged to have resulted from a failure in SCE's overhead power line equipment. After a bifurcated jury trial, judgments were entered on June 20, 1997, in favor of plaintiffs Virgil and Alice Barham (the Barhams) on their causes of action for negligence, nuisance and trespass in the amount of $400,500, and in favor of plaintiffs GTE California Incorporated (GTE) and California Department of Forestry and Fire Protection (CDF), on their causes of action for negligence in the amounts of $193,804 and $295,637, respectively. SCE appeals each of the judgments entered claiming several grounds of error. As to all three judgments, SCE asserts five errors in evidentiary rulings, a cumulative prejudicial effect requiring reversal, a lack of substantial evidence to support the liability verdict, and an error in a jury instruction alleged to have combined theories of negligence and negligence per se. In addition to the above, as to the Barhams' judgment SCE asserts an error in a jury instruction on the proper measure of damages and an error in awarding postjudgment interest. Also, as to GTE, SCE claims error in the awarding of prejudgment and postjudgment interest. Finally, as to CDF, SCE claims error in the awarding of prejudgment interest. We find each of SCE's assertions of error to be without merit and therefore affirm the judgments.

On October 7, 1997, the court amended the Barhams' judgment nunc pro tunc to reflect judgment in favor of SCE on the Barhams' cause of action for inverse condemnation. The Barhams appeal, claiming they were entitled to

prevail on their cause of action for inverse condemnation.[1] We agree and reverse the Barhams' judgment as to that cause of action.

## FACTS

At approximately 6:37 on the morning of October 27, 1993, strong Santa Ana wind conditions caused a section of SCE's 12,000-volt (12kv) power line to break. That uninsulated line momentarily contacted an uninsulated 33,000-volt (33kv) line suspended above it, sending 33kv of power down the 12kv line. When that extra voltage hit a 15,000-volt-rated lightning arrester (AR-182) on a pole three-quarters of a mile away, the arrester failed, causing superheated components to fall to the ground, igniting a brush fire. Richard Cale, a meteorologist, estimated that at the time the fire broke out, the wind speeds averaged 21 miles per hour with 37-mile-per-hour gusts 10 feet above the ground, and averaged 30 miles per hour with 44-mile-per-hour gusts 45 feet above the ground.

Paul Woodruff, traveling down Highway 38 in San Bernardino County, arrived near the subject pole very soon after the fire ignited. At that time the wind was beginning to blow flames across the road. Shortly after his arrival he noted there was vegetation burning in a ten-foot-long triangular area which came as close as three or four feet from the subject pole. There was a clearing of vegetation around the pole, but there was some vegetation within the clearing area, which was burning. The flames were being blown down the canyon to the southwest, away from the pole. Mr. Woodruff never saw vegetation burning to the north of the subject pole.

Kurt Hayden, a heavy equipment operator employed by the United States Forest Service at the Mill Creek ranger station, also responded to the scene of the fire shortly after it broke out. When he arrived, he determined the fire appeared to have come from the area at the bottom of the pole. An area within 3 to 4 feet from the base of the pole still had hot ash and smoke in it but the flames had moved some 70 feet to 50 yards from the pole. While he was in the area of the pole, he observed a "backburn" phenomenon, where the flames burned back from their starting point into the wind instead of with it, to the northeast of the pole. That area had not yet begun burning when he first arrived at the scene.

Bruce Brown, a fire investigator, was assigned by his employer, the CDF, to investigate the cause and origin of the Mill Creek fire. He was directed by

---

[1]The Barhams' notice of cross-appeal raised three assignments of error. However, in their respondents'/cross-appellants' brief, they specifically abandoned all issues save their cause of action for inverse condemnation.

Don Buyak of the United States Forest Service to the location where the fire was believed to have started, in the vicinity of the subject pole. Mr. Brown prepared an investigation report, which he later admitted had some discrepancies with times, as well as other problems. He also admitted he had not previously investigated any wildland fires where high voltage electrical transmission facilities were involved and did not know what a lightning arrester was or what the internal components of one looked like. He noticed some damage at the top of the subject pole and some debris on the ground within a 10-foot area around the pole that appeared to have once been an insulator. He also saw some burn patterns within this 10-foot area, some 12 to 20 inches from the pole. He visually examined the burn indicators within a 15-foot radius of the pole and concluded the fire had begun within the 10-foot clearance area. His examination also revealed the presence of a backburn phenomenon to the north of the pole.

Oscar Burrell, Chief of the Fire Prevention Bureau of the CDF in Santa Cruz, was assigned to assist Mr. Brown in his investigation. In attempting to confirm or disprove Mr. Brown's conclusions, he also visited the scene around the subject pole, performed an investigation and prepared a report of his findings. While he was investigating, he found pieces of the lightning arrester both within and outside the 10-foot radius of the pole. He also concluded that the area of origin of the fire was within the 10-foot radius of the subject pole and that the burn to the north of the pole was a backburn.

Klaus Radtke, a resource scientist, reconstructed the fuels which were available within the 10-foot radius of the pole on the day of the fire, as well as the fire start and fire spread. He observed flammable plant materials and evidence of burned vegetation within the 10-foot radius of the pole in the postfire photographs. He also opined the most likely place the fire began was near a bush within the 10-foot radius of the pole.

SCE hired a landscape contractor to remove vegetation to mineral earth in a 10-foot radius under certain of its power poles, including the subject pole, for fire prevention purposes. This removal was to occur one time per year. In 1993, the subject pole was cleared on March 11. The contractor was not surprised at the level of vegetation which had regrown in the clearance zone by the time of the fire.

Joseph Osterhout, an electrical engineer who specializes in lightning arresters, has observed many kinds of staged over-voltage situations to test lightning arresters. Typically, when arresters "fail" due to over-voltage, the superheated internal components fall below where the arrester is mounted, while the porcelain shell pieces are projected outward. In his opinion, while

the internal silicon carbide blocks would retain enough heat to ignite a fire after falling from the pole, the porcelain pieces are far less likely to have done so. Absent the action of other forces upon the silicon carbide blocks, generally they would fall to the ground below where they were housed in the arrester, approximately four feet northwest of the pole. Mr. Osterhout did not attempt to perform any calculations with respect to the effect the prevailing winds would have had on the falling silicon carbide blocks.

Lester Hendrickson, a metallurgic engineer and physicist, attempted to determine the probable cause of the subject fire, including the likely trajectories of objects falling from the position of the failed lightning arrester. In his opinion, absent any forces on them, the silicon carbide blocks would have dropped straight down out of the arrester. However, because of the action of the wind on them, they would have moved from 3.25 to 7.42 feet from the spot where they began to fall, depending on wind velocity. He also analyzed the heat retention characteristics of the components of the arrester and determined the silicon carbide blocks would have been the most likely elements to have ignited brush after falling from the pole.

T. C. Cheng, a professor of electrical engineering, testified the silicon carbide blocks would have been propelled out to the southeast when the arrester broke and would not have landed within the 10-foot radius of the pole. Charles Hickey, an SCE investigator with experience investigating failed lightning arresters, testified in some instances, the arrester blows up and the silicon carbide blocks are propelled as far as 40 feet. He could not recall ever having seen a situation where the internal components of the arrester were within the 10-foot area directly below the arrester.

The United States Forest Service ended up participating in fighting this fire as a mutual aid situation since it was so close to its jurisdiction. The fire began in an area of CDF responsibility and went through several territorial boundaries. CDF responded first and was therefore the primary firefighting agency for this fire.

I

DISCUSSION*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 744.

## II

### The Barhams' Cross-appeal

The Barhams appeal from the portion of the judgment granted in favor of SCE on the Barhams' cause of action for inverse condemnation. They claim the trial court erred when it determined there had been no taking for a public use. We agree and reverse.

Typically, a party cannot appeal from a judgment in its favor. (*In re Marriage of Brockman* (1987) 194 Cal.App.3d 1035, 1041-1042 [240 Cal.Rptr. 96].) There are, not surprisingly, exceptions to this general rule. When a party is awarded less than has been demanded, that party may appeal from the unfavorable part of the judgment. In the instant case, while the Barhams are the prevailing party, they are nonetheless aggrieved by the judgment in favor of SCE on their inverse condemnation action due to the prejudgment interest (see, e.g., *Customer Co.* v. *City of Sacramento* (1995) 10 Cal.4th 368, 390 [41 Cal.Rptr.2d 658, 895 P.2d 900]) and additional damages they would be entitled to receive under Code of Civil Procedure section 1036.[12] Therefore, we must consider the cross-appeal.

In order to prevail on their cause of action for inverse condemnation, the Barhams must prove that a public entity has taken or damaged their property for a public use. (*San Diego Gas & Electric Co.* v. *Superior Court* (1996) 13 Cal.4th 893, 939-940 [55 Cal.Rptr.2d 724, 920 P.2d 669].) Article I, section 19 (formerly § 14) of the California Constitution has been interpreted by our Supreme Court to mean that "any actual physical injury to real property proximately caused by [a public] improvement as deliberately designed and constructed is compensable . . . whether foreseeable or not." (*Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250, 263-264 [42 Cal.Rptr. 89, 398 P.2d 129].)

In the instant case, we have already concluded there was substantial evidence to support the jury's finding that SCE's negligence was a substantial cause of damage to property owned by the Barhams. We must now determine whether SCE was a "public agency" that damaged the Barhams'

---

[12]"In any inverse condemnation proceeding, the court rendering judgment for the plaintiff by awarding compensation, . . . shall determine and award or allow to the plaintiff, as a part of that judgment or settlement, a sum that will, in the opinion of the court, reimburse the plaintiff's reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of that proceeding in the trial court or in any appellate proceeding in which the plaintiff prevails on any issue in that proceeding." (Code Civ. Proc., § 1036.)

property for a "public use." ■ Whether a use is public or private is a question of law. (*Locklin* v. *City of Lafayette* (1994) 7 Cal.4th 327, 369-370 [27 Cal.Rptr.2d 613, 867 P.2d 724].) Therefore, we independently review the decision of the trial court. (*San Diego Gas & Electric Co.* v. *City of Carlsbad* (1998) 64 Cal.App.4th 785, 792 [75 Cal.Rptr.2d 534].)

■ An inverse condemnation action is an eminent domain action initiated by one whose property was taken for public use, as opposed to by the condemning public agency. As such, the principles of eminent domain law apply to inverse condemnation proceedings. (*Belmont County Water Dist.* v. *State of California* (1976) 65 Cal.App.3d 13, 19, fn. 3 [135 Cal.Rptr. 163].) ■ Public Utilities Code section 612 provides, "An electrical corporation may condemn any property necessary for the construction and maintenance of its electric plant." "Electric plant" includes electrical transmission facilities such as those at issue in this case. (Pub. Util. Code, § 217.) " 'Electrical corporation' includes every corporation or person owning, controlling, operating, or managing any electric plant for compensation within this state, except where electricity is generated on or distributed by the producer through private property solely for its own use or the use of its tenants and not for sale or transmission to others." (Pub. Util. Code, § 218, subd. (a).) Therefore, generally, condemning private property for the transmission of electrical power is a public use and inverse condemnation will apply. (*Slemons* v. *Southern Cal. Edison Co.* (1967) 252 Cal.App.2d 1022, 1026 [60 Cal.Rptr. 785].) ■ The fundamental policy underlying the concept of inverse condemnation is to spread among the benefiting community any burden disproportionately borne by a member of that community, to establish a public undertaking for the benefit of all. (*Belair* v. *Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 558 [253 Cal.Rptr. 693, 764 P.2d 1070].)

■ At oral argument SCE strongly urged that inverse condemnation principles should not apply in this case because SCE is a privately owned public utility, not a public entity. In support of this position, SCE cited *Breidert* v. *Southern Pac. Co.* (1964) 61 Cal.2d 659 [39 Cal.Rptr. 903, 394 P.2d 719], for the proposition that a public utility (there a railroad) may only be liable in inverse condemnation when it jointly participates with a public entity in depriving a person of property rights. However, the cases *Breidert* cites as authority do not support the interpretation urged by SCE. In no way was it the coparticipation with a public entity which was dispositive. Two other cases cited by SCE urging it should not be likened to a public entity, *Automatic Sprinkler Corp.* v. *Southern Cal. Edison Co.* (1989) 216 Cal.App.3d 627 [266 Cal.Rptr. 662] and *Moreland Investment Co.* v. *Superior Court* (1980) 106 Cal.App.3d 1017 [165 Cal.Rptr. 427], are specifically

limited to their facts and to the statutory schemes involved therein. (See *Automatic Sprinkler Corp.* at p. 633, and *Moreland Investment Co.* at pp. 1021-1022.)

On the other hand, in *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458 [156 Cal.Rptr. 14, 595 P.2d 592], which held that a public utility was a state actor subject to the equal protection guarantee when hiring employees, the Supreme Court held that a public utility is in many respects more akin to a governmental entity than to a purely private employer. The court held, "[m]oreover, the nature of the California regulatory scheme demonstrates that the state generally expects a public utility to conduct its affairs more like a governmental entity than like a private corporation." (*Id.* at p. 469.) Further, it concluded, under the circumstances imposed by the regulatory scheme, "we believe . . . that a public utility may not properly claim prerogatives of 'private autonomy' that may possibly attach to a purely private business enterprise." (*Id.* at p. 470.) Thus, there are cases in which the courts are willing to hold public utilities to the standards imposed on public entities.

We believe this is such a case. Were we to adopt SCE's position, we would be required to differentiate between damage resulting from the operation of a utility based solely upon whether the utility is operated by a governmental entity or by a privately owned public utility. Publicly owned electric utilities have been held liable in inverse condemnation in situations virtually identical to this case. (See *Marshall* v. *Department of Water & Power* (1990) 219 Cal.App.3d 1124 [268 Cal.Rptr. 559] and *Aetna Life & Casualty Co.* v. *City of Los Angeles* (1985) 170 Cal.App.3d 865 [216 Cal.Rptr. 831].) We are not convinced that any significant differences exist regarding the operation of publicly versus privately owned electric utilities as applied to the facts in this case and find there is no rational basis upon which to found such a distinction. We conclude, under the factual scenario here present, SCE may be liable in inverse condemnation as a public entity. Further, article I, section 19 of the California Constitution and the cases which interpret and apply it have as their principal focus the concept of public use, as opposed to the nature of the entity appropriating the property.

In addressing the concept of public use, the parties have commingled the analysis of which entities may be liable and which uses may be public. They have focused on the issue of whether SCE could have exercised eminent domain over the land on which its electrical transmission facilities were located. Their arguments concern SCE's ownership of the land (SCE claims the construction of electrical transmission facilities on its own land creates a

private as opposed to a public use), and whether a franchise from San Bernardino County to SCE establishes a joint enterprise (the Barhams argue it does and based upon that joint action, a public use exists). As stated above, the joint action concept is foreign to our analysis. Further, these assertions miss the point entirely. The question does not concern the land upon which the electrical transmission facilities were located. Rather, the issue is whether the Barhams' property was taken for a public use, i.e., the transmission of electric power to the public. The evidence reflects the circuit, of which the subject pole and transmission wires were a part, provides electric service to more than 1,000 households. Based upon the above cited authority, we must conclude that the transmission of electric power through the facilities that caused damage to the Barhams' property was for the benefit of the public. (See, e.g., *Slemons* v. *Southern Cal. Edison Co.*, *supra*, 252 Cal.App.2d at p. 1026 [electric transmission lines to three customers was a public use].) Thus, the Barhams' property was "taken or damaged" for a public use.

This case differs from *Cantu* v. *Pacific Gas & Electric Co.* (1987) 189 Cal.App.3d 160 [234 Cal.Rptr. 365], which held inverse condemnation did not apply, and which was heavily relied upon by the parties and the trial court. As did the parties in this case, the court in *Cantu* focused its analysis on the means by which the public utility obtained the land upon which its facilities were located and not, as SCE urged at oral argument, on the private corporate status of the utility. The facilities at issue in *Cantu* were found to have been designed to fulfill an individual need. The court concluded the use was "unlike the construction of permanent transmission towers or power lines . . . which are designed to transmit electricity over a much greater area . . . ." (*Id.* at p. 164.) Those are precisely the type of facilities with which we are concerned in the present case. The *Cantu* court based its decision upon a public policy conclusion that under the specific facts of that case, when the running of line extensions to plaintiffs' residence is what caused plaintiffs' damage, it would be unfair to spread the cost to the public at large through inverse liability. (*Id.* at p. 165.) It also concluded since the utility had not exercised eminent domain to obtain the land, it had not "made an economic business decision" to assume liability if its facilities caused damage to neighboring property. (*Ibid.*) Therefore, the public policy basis for the court's decision was not overcome by principles of eminent domain. As previously illustrated, the facts of our case involve a much greater service to the public at large. *Cantu* does not alter our decision.

Similarly, *Customer Co.* v. *City of Sacramento*, *supra*, 10 Cal.4th 368, cited by SCE, is distinguishable. Customer sustained damages in excess of

$275,000 in the form of damage to real property, lost inventory and cleanup costs when the city police officers used tear gas and mace to subdue and apprehend a felon who had taken refuge inside Customer's convenience store. It thereafter sued the city claiming inverse condemnation. (*Id.* at pp. 371-375.) The court held the city's actions constituted an exercise of its police powers which required no compensation under the just compensation clause. (*Id.* at pp. 383-385.) In so doing, the court recognized its earlier decision in *Holtz* v. *Superior Court* (1970) 3 Cal.3d 296 [90 Cal.Rptr. 345, 475 P.2d 441], that inverse condemnation liability is limited to physical injuries to real property caused by a public improvement as deliberately constructed and planned. From this it concluded "the property damage for which Customer seeks to recover bears no relation to a 'public improvement' or 'public work' of any kind. Instead, the damage was caused by actions of public employees having 'no relation to the function' of a public improvement whatsoever." (*Customer Co.* v. *City of Sacramento, supra,* 10 Cal.4th at p. 383.) A clear distinction has been recognized between inverse condemnation which arises out of damage to property caused by the construction or maintenance of public works and that which arises out of an exercise of police powers. (See, e.g., *Rose* v. *City of Coalinga* (1987) 190 Cal.App.3d 1627, 1633-1634 [236 Cal.Rptr. 124].) In the instant case, the damage arose out of the functioning of the public improvement as deliberately conceived, altered and maintained. Therefore, even under the principles outlined in *Customer*, the Barhams are entitled to recover in inverse condemnation in the instant case. (*Customer Co.* v. *City of Sacramento, supra,* 10 Cal.4th at p. 382.)

SCE urges *Customer* stands for the proposition that conduct which amounts to negligence cannot support inverse condemnation liability. We do not agree. In fact, several courts have held inverse condemnation principles apply in cases very similar to that at bar. (See, e.g., *Marshall* v. *Department of Water & Power, supra,* 219 Cal.App.3d 1124 [homeowners recover in inverse condemnation for property consumed by brush fire resulting from downed power cables]; *Aetna Life & Casualty Co.* v. *City of Los Angeles, supra,* 170 Cal.App.3d 865 [homeowners recover in inverse condemnation for property consumed by brush fire resulting from arcing power cables].) *Customer* provides no basis for invalidating these cases.

The Barhams filed a request for judicial notice in support of their cross-appeal. By order dated January 21, 1999, we reserved ruling on that request for decision with the appeal. Because we find the matters as to which judicial notice was requested unnecessary to our decision, we decline to exercise our discretion to take judicial notice of those documents. (Evid. Code, § 459.)

## DISPOSITION

The judgments for GTE and CDF are affirmed. The judgment for the Barhams is affirmed with the exception of the portion of the judgment which is in favor of SCE on the Barhams' claim for inverse condemnation, which is reversed. GTE, CDF and the Barhams to recover their costs on appeal.

Richli, J., and Gaut, J., concurred.

A petition for a rehearing was denied September 23, 1999, and the petition of appellant Southern California Edison Company for review by the Supreme Court was denied November 23, 1999. Werdegar, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.