[No. 22894-1-III. Division Three. February 3, 2005.]

GRANT COUNTY PUBLIC UTILITY DISTRICT No. 2, *Respondent*, v. NORTH AMERICAN FOREIGN TRADE ZONE INDUSTRIES, L.L.C., ET AL., *Appellants*.

*Frank R. Siderius* (of *Siderius, Lonergan & Martin, L.L.P.*), for appellants.

*David E. Sonn* and *Kari D. Kube* (of *Jeffers, Danielson, Sonn & Aylward, P.S.*) and *Ray A. Foianini*, for respondent.

¶1 BROWN, J. — This is a condemnation dispute between Grant County Public Utility District No. 2 (PUD) and North American Foreign Trade Zone Industries, L.L.C. (NAFTZI) involving land leased from NAFTZI by the PUD for its diesel power generation facility. We first decide whether the trial court erred in reconsidering and reversing an initial order declaring the PUD had given inadequate statutory notice of the initiating resolution. Next, we decide whether the trial court abused its discretion in not requiring the PUD to refile the condemnation petition. Finally, we decide whether the trial court erred in granting its order of public use and necessity. Finding no error, we affirm.

## FACTS

¶2 In late 2000 and early 2001, an electricity shortage caused power prices to significantly spike. In response to the resulting energy supply crisis, Governor Gary Locke issued proclamations and energy supply alert orders. By March 2001, the PUD had declared an energy emergency, acquiring 20 diesel generators with a capital cost of about $27 million. Similarly, other utilities were electing to purchase or lease diesel generators to lessen power purchases and "augment the amount of power available to sell." Clerk's Papers (CP) at 508.

¶3 On April 9, 2001, NAFTZI and the PUD signed a 15-month lease for 20 acres of unimproved land adjacent to PUD property. The lease was renewable for up to 12 months and terminated on July 31, 2003. The PUD declined a proposed purchase option, but negotiations continued. By June 18, 2003, lease extension, purchase, and condemnation negotiations apparently broke down when NAFTZI's corporate counsel wrote in response to a PUD June 16 letter that the landowner was "more than willing to defend a condemnation action." CP at 660. The writer refused to concede "the 'public purpose' requirement for condemnation" at that time. CP at 661. Further, corporate counsel accused the PUD of dealing in "bad faith" when all his principal wanted was "fair market value for the property." CP at 661. On July 14, 2003, the PUD passed Resolution 7643 authorizing condemnation of approximately 10 acres of the leasehold.

¶4 Critical here is the process leading to Resolution 7643. Mary L. Heston, PUD's Executive Secretary, declared the week before the July 14 public hearing she followed her regular "procedure" and compiled the July 14 agenda. CP at 662-63. The agenda shows Resolution 7643 was to be considered by the PUD Commission. The agenda was faxed to newspapers and radio stations, sent electronically to all district employees and individuals who had requested notification, sent to the PUD commissioners, and posted outside the commission's meeting room. The agenda identified Resolution 7643 as a "Resolution Authorizing the Acquisition By Condemnation of Certain Real Property." CP at 665.

¶5 Resolution 7643 recited the property's legal description and approximate size and specified that purchase negotiations had failed. It also contained statements of public use and necessity, named the owners of the described property, including NAFTZI, and authorized a condemnation suit. As noted below, PUD's counsel later argued the agenda's reference to the proposed resolution satisfied the court's notice concerns because the public could inspect the

proposed resolution as part of the PUD's public record, but we could not find that process explained.

¶6 On July 17, 2003, the PUD filed the condemnation petition. In September 2003, NAFTZI responded, admitting passage of Resolution 7643, but denying a public use and necessity. Affirmatively, NAFTZI alleged the need for a "buffer" and, "that the entire 20 acres as originally agreed under the Lease be the subject of this action" or alternatively "that additional damages be awarded for the adverse effects" of not providing a buffer for the generators. CP at 17.

¶7 No notice issue was raised until November 17, 2003 when NAFTZI moved to dismiss based upon lack of "statutory notice required to legislatively initiate [condemnation]." CP at 22. The PUD responded that NAFTZI sought greater notice than required by law.

¶8 But before the hearing on the dismissal motion, the PUD sent out an agenda in the described manner for a December 15, 2003 meeting. Additionally, the PUD specially notified NAFTZI's counsel. Further, it specially published proposed alternative resolutions for the December public meeting, one dismissing the pending condemnation and the other ratifying Resolution 7643. The second alternative was described as, "[a] Resolution Ratifying Resolution No. 7643 Relating To The Acquisition By Condemnation Of Certain Real Property For Use As A Diesel Generation Site." CP at 668. At the December hearing, NAFTZI unsuccessfully argued for dismissal. On December 29, the commission adopted the second alternative, Resolution 7680, ratifying Resolution 7643.

¶9 On January 15, 2004, the trial court considered and orally granted NAFTZI's dismissal request, adopting NAFTZI's view that the PUD gave inadequate notice describing the affected land. The trial court did not rule on the effect of the "December notice." Report of Proceedings (RP) (Jan. 14, 2004) at 30. The trial court's written order was subject to the PUD's reconsideration motion set for February 20.

¶10 Reconsideration was partly prompted when the PUD pointed out the July agenda "referenced [Proposed Resolution 7643], that was part of the public record." RP (Jan. 14, 2004) at 31. The PUD insisted:

> As far as the city and town statutes are concerned, we complied with those statutes. If you read those statutes, for example, [RCW] 35.23.221, it says, promptly *after* adoption of the ordinance, you publish it. In this case, there has been publication of the resolution.

RP (Jan. 14, 2004) at 31 (emphasis added). The court responded: "I'm not requiring a publication." RP (Jan. 14, 2004) at 31.

¶11 On February 20, the court considered the December events, particularly Resolution 7680, ratifying Resolution 7643. The trial court reversed its prior dismissal order "based upon CR 15 & ratification case law." CP at 93.

¶12 On April 1, 2003 the trial court granted the PUD's motion for determination of public use and necessity. The court favorably considered several declarations explaining the initial need for the generators and the current necessity to keep the generators to meet the PUD's electrical load, reliability, and reserve need requirements. Partly based on dismantlement costs and salvage values, the court rejected NAFTZI's argument that the PUD merely meant to profit from the generators and no longer needed the generators to serve a public use. The court concluded "there's a reasonable basis for [the PUD] to reach its decision that it needs to keep these generators at this location and therefore condemn the property." RP (Apr. 1, 2004) at 95. The court ruled the case should proceed to trial.[1] This appeal followed.[2]

---

[1] NAFTZI commenced an unlawful detainer action against the PUD that the trial court consolidated with the condemnation action and stayed during this appeal.

[2] A commissioner of this court ruled NAFTZI could appeal both the motion for reconsideration and the order on public use and necessity under *Franz v. Lance*, 119 Wn.2d 780, 782, 836 P.2d 832 (1992) (permitting review of an underlying judgment despite the fact that the notice of appeal sought only review of an order imposing sanctions because judgment prejudicially affected the sanctions order).

## ANALYSIS

### A. Reconsideration Order

¶13 The issue is whether the trial court erred in reconsidering and denying NAFTZI's motion to dismiss for lack of statutory notice of the PUD's intent to initiate condemnation proceedings and concluding Resolution 7680 properly ratified Resolution 7643.

¶14 We review a trial court's decision on a reconsideration motion for abuse of discretion. *Weems v. N. Franklin Sch. Dist.*, 109 Wn. App. 767, 777, 37 P.3d 354 (2002). Abuse of discretion occurs when the trial court's decision rests on untenable grounds or untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

¶15 NAFTZI contends Resolution 7680 could not ratify Resolution 7643 because under *Port of Edmonds v. Northwest Fur Breeders Cooperative, Inc.*, 63 Wn. App. 159, 816 P.2d 1268 (1991), the proper remedy is to start the condemnation process anew. Procedural error (e.g., lack of proper notice) is a question of law given de novo review. *State v. Harris*, 114 Wn.2d 419, 441, 789 P.2d 60 (1990).

¶16 RCW 54.16.020 empowers a PUD to acquire property by eminent domain. "The right of eminent domain shall be exercised pursuant to resolution of the commission and conducted in the same manner and by the same procedure as is provided for the exercise of that power by cities and towns." RCW 54.16.020. Chapter 8.12 RCW relates to eminent domain by cities. When a city desires to condemn property, the process is begun with an ordinance adopted by the city's municipal authority. RCW 8.12.040. Notably, no specific requirements for the form, content, or notice of such an ordinance are found in RCW 8.12.040. Once the ordinance is passed, the city files a petition in the superior court requesting a decree of public use and necessity and a determination of just compensation. RCW 8.12.050; *City of Des Moines v. Hemenway*, 73 Wn.2d 130, 138, 437 P.2d 171 (1968).

¶17 The condemnation petition must contain a copy of the ordinance and a "reasonably accurate description" of the property to be taken. RCW 8.12.060. The basic purpose of RCW 8.12.060 "is to acquaint the condemnee and the court with the nature and extent of the authority under which the municipal condemnor is proceeding." *City of Tacoma v. Welcker*, 65 Wn.2d 677, 687, 399 P.2d 330 (1965). Relevant to Resolution 7680, the requirements of RCW 8.12.060 are "not jurisdictional in the sense that an infirmity therein cannot be corrected by timely and appropriate amendment." *Id.* NAFTZI does not challenge the form of the condemnation petition or the adoption process leading to Resolution 7680. Rather it argues the process leading to Resolution 7643 was fatally flawed and could not be ratified or rehabilitated by Resolution 7680.

¶18 NAFTZI incorrectly relies on *Northwest Fur Breeders* because that court considered a different statutory scheme. The Port was required by statute to exercise its power of eminent domain in the same manner and by the same procedure as provided for cities of the first class. *N.W. Fur Breeders*, 63 Wn. App. at 165-66 (citing RCW 53.08.010). While the court ultimately decided the Port must begin the condemnation process anew due to improper notice, those notice requirements are not discussed in chapter 8.12 RCW, relating to cities and applicable to public utility districts. The PUD does not have to meet the notice requirements discussed in *Northwest Fur Breeders*.

¶19 Here, because the PUD followed the applicable statutory scheme, the trial court incorrectly dismissed the PUD's condemnation action for lack of statutory notice of Resolution 7643. However, the trial court did correctly rule the agenda process used for Resolution 7680 gave notice, albeit additional notice, to NAFTZI of PUD's intent to condemn. NAFTZI received special notice and Proposed Resolution 7680 was published beginning December 1, 2003, before the December 15 public meeting and adoption on December 29.

¶20 NAFTZI wisely does not contest the form of the condemnation petition. RCW 8.12.060 merely requires the petition to contain a copy of the ordinance and a "reasonably accurate description" of the property to be taken. It is undisputed that resolutions are the equivalent of ordinances here. The parties do not dispute that both Resolution 7643 and Resolution 7680 contain a reasonably accurate description of the condemned property and the other statutory essentials.

¶21 NAFTZI argues if the Resolution 7680 process alone cured the alleged defects, the condemnation process should still have started anew under *Northwest Fur Breeders*. Not so. First, as noted, *Northwest Fur Breeders* is not applicable; we decline to extend that holding. Second, *Northwest Fur Breeders* is further distinguishable because no second resolution was before that court as is the case here. Third, Resolution 7680 successfully passed before the court initially ruled on NAFTZI's dismissal motion, which was expressly subject to reconsideration, and well before the public use and necessity hearing. No legal purpose is served by beginning the condemnation anew. Fourth, any infirmity in notifying NAFTZI of the nature and extent of the PUD's condemnation procedure could be corrected by timely and appropriate amendment. *Welcker*, 65 Wn.2d at 687. Finally, the parties discussed condemnation just before the July 2003 agenda publication, disagreeing on just compensation, a yet-to-be litigated issue.

¶22 In sum, we hold the PUD used a statutorily permissible process to adopt each resolution.

## B. Public Use and Necessity

¶23 The issue is whether the trial court erred in deciding public use and necessity.

¶24 A decree of public use and necessity may be entered if (1) the use is really public, (2) public interests require it, and (3) the property in question is necessary to facilitate the public use. *Hemenway*, 73 Wn.2d at 138.

Although a PUD's declaration of public use is accorded great weight, the trial court must determine whether the acquisition is for a public use. *Id.* at 138-39. When a PUD declares a particular acquisition necessary, that declaration is conclusive unless the condemnee can prove actual fraud or such arbitrary and capricious conduct as would constitute constructive fraud. *Id.* at 139.

¶25 Here, the PUD declared the public use and necessity of its condemnation action was to furnish "the inhabitants of [the PUD], and any person including public and private corporations within or without the limit of [the PUD], with electric current and energy and to construct facilities for the transmission and distribution thereof." Ex. P2.

¶26 "The constitution prohibits the taking of private property for a private use." *State ex rel. Wash. State Convention & Trade Ctr. v. Evans*, 136 Wn.2d 811, 817, 966 P.2d 1252 (1998). However, "[a]s long as the property was condemned for the public use, it may also be put to a private use that is merely incidental to that public use." *Id.* (citing *Chandler v. City of Seattle*, 80 Wash. 154, 159, 141 P. 331 (1914)).

¶27 Our Supreme Court has ruled that power production is a public use. *Evans*, 136 Wn.2d at 821 n.3 (citing *State ex rel. Chelan Elec. Co. v. Superior Court*, 142 Wash. 270, 272, 253 P. 115 (1927)). Other jurisdictions rule similarly. *See Barham v. S. Cal. Edison Co.*, 74 Cal. App. 4th 744, 752, 88 Cal. Rptr. 2d 424 (1999) (transmission of electrical power is a public use); *Town of Fayal v. City of Eveleth*, 587 N.W.2d 524, 528 (Minn. Ct. App. 1999) (supplying electricity, even if provided by a quasi-public entity, is a public use).

¶28 Contrary to NAFTZI's argument that the PUD merely seeks to cut its losses, substantial evidence in the PUD declarations supports the inferences reached by the trial court. The diesel generators help meet the PUD's electrical load, reliability, and reserve need requirements. The weight of necessity evidence was within the court's factfinding discretion. In view of the past energy crisis, the

need for reserve capacity, while tentative, is, nevertheless, real. Clearly, the uses noted are public in nature.

¶29 The PUD leased 20 acres from NAFTZI, but sought to condemn just 10 acres. Although NAFTZI noted its concern that a buffer is needed to protect its property, that concern is better considered as bearing on just compensation. Moreover, whether a government, or quasi-public entity, seeks to condemn more property than is necessary to accomplish the public component of the project is relevant. *Evans*, 136 Wn.2d at 822. "If the anticipated public use alone would require taking no less property than the government seeks to condemn, then the condemnation is for the purpose of a public use and any private use is incidental." *Id.* Here, the PUD is arguably limiting its taking to the minimum acreage needed, undermining NAFTZI's contrary argument.

¶30 As for NAFTZI's contention that the diesel generators are not necessary, it fails to assert fraud or arbitrary and capricious actions sufficient to constitute constructive fraud. *Hemenway*, 73 Wn.2d at 139. Absent proof of fraud or capriciousness, the PUD's declaration of necessity is conclusive. *Id.* Moreover, the declarations provided by the PUD substantially support the proposition that the generators were initially needed to offset its power deficiencies and are now useful in meeting the PUD's future electrical load, reliability, and reserve need requirements. In view of the past energy crisis, the trial court had a tenable basis to reject NAFTZI's argument that the diesel acquisitions were prompted solely for a profit motive.

¶31 In sum, we conclude the trial court's determination of public use is supported by substantial evidence in this record. Further, in the absence of proof of fraud or arbitrary and capricious behavior amounting to constructive fraud, we will not disturb a legislative determination that the acquisition of NAFTZI's land is necessary for public use.

634

## CONCLUSION

¶32 The trial court did not err in reconsidering and reversing its initial order declaring the PUD gave inadequate statutory notice of the PUD's intent to initiate condemnation. The PUD used statutorily proper notice procedures in adopting both resolutions. The trial court did not abuse its discretion in denying NAFTZI's request to begin the condemnation proceedings anew. Substantial evidence supports the trial court's public use and necessity determination in favor of the PUD.

¶33 Affirmed.

SWEENEY, A.C.J., and KURTZ, J., concur.

Review granted at 154 Wn.2d 1021 (2005).

