[No. B230470. Second Dist., Div. One. Aug. 30, 2012.]

PACIFIC BELL TELEPHONE COMPANY, Plaintiff and Respondent, v. SOUTHERN CALIFORNIA EDISON COMPANY, Defendant and Appellant.

**COUNSEL**

Munger, Tolles & Olson, Henry Weissmann, Paul J. Watford, Leo Goldbard; and Brian A. Cardoza for Defendant and Appellant.

Gleam O. Davis for Plaintiff and Respondent.

**OPINION**

**CHANEY, J.**—Defendant Southern California Edison Company (Edison) appeals from the judgment entered against it following a bench trial in which the court ruled that Edison was liable to Pacific Bell Telephone Company (Pacific Bell) for just compensation in Pacific Bell's cause of action for inverse condemnation. We affirm.

## FACTUAL AND PROCEDURAL SUMMARY

The relevant facts of this appeal are not disputed. Edison has installed bird guards to prevent animal contact with energized components of its electrical facilities. Unfortunately, on January 11, 2006, near the intersection of Valley Street and Lyons Avenue in Newhall, these guards did not prevent a large bird from coming into simultaneous contact with an energized power line and grounded equipment on a utility pole, causing the bird's death and a ground fault that sent electricity through Pacific Bell's underground telephone cables, burning several of them. Although Pacific Bell was aware of the risk to its equipment from ground faults, Pacific Bell's underground system was not designed to withstand such faults and was placed in the same trench as Edison's facilities to reduce overall costs. The parties stipulated that the damage to Pacific Bell's telephone cables was $74,767.39.

In December 2008, Pacific Bell filed suit against Edison asserting causes of action for negligence and inverse condemnation. Prior to the bench trial, Pacific Bell apparently dismissed its negligence claim so that only the inverse condemnation claim proceeded to trial.

In its statement of decision, the trial court rejected Edison's argument that it was a private entity and could not be held liable in inverse condemnation. Based on the Fourth District's opinion in *Barham v. Southern Cal. Edison Co.* (1999) 74 Cal.App.4th 744 [88 Cal.Rptr.2d 424] (*Barham*), the trial court concluded that Edison "may be liable as a public entity in inverse condemnation." Quoting *Barham*, the trial court stated: "We are not convinced that any significant differences exist regarding the operation of publicly versus privately owned electric utilities as applied to the facts in this case and find there is no rational basis upon which to found such a distinction." (*Barham, supra*, at p. 753.)

The trial court also rejected Edison's argument that, if it was liable for inverse condemnation, a strict liability standard was inappropriate and a reasonableness standard should be applied. The trial court noted that Edison had not cited any cases applying the reasonableness standard outside the flood control context and declined to apply such a standard in this case.[1]

The court awarded Pacific Bell the stipulated damages amount as well as prejudgment interest, attorney fees and costs for a total judgment of $123,841.95.

---

[1] The *Barham* trial court also held that the damage to Pacific Bell's property was caused by a public improvement as deliberately designed and constructed, and that the property was damaged for a public use. On appeal, Edison does not challenge these two determinations.

## DISCUSSION

### I. *Edison's Liability for Inverse Condemnation*

On appeal Edison contends that the central case relied upon by the trial court in finding Edison liable for inverse condemnation, *Barham, supra*, 74 Cal.App.4th 744, wrongly interpreted Supreme Court precedent to hold a privately owned public utility like Edison may be liable for inverse condemnation as a public entity. (*Id.* at p. 753.) Edison also argues that under California Supreme Court case law, a privately owned public utility like Edison can be held liable for inverse condemnation only in two limited situations: (1) where the private entity takes or damages private property directly through the exercise of eminent domain power delegated to it by the Legislature and (2) where the conduct that causes the taking or damaging of property involves joint participation of a government entity.

We find Edison's reading of the Supreme Court cases to be overly limited and agree with the conclusion reached in *Barham* and by the trial court that Edison may be liable under inverse condemnation for the damage to Pacific Bell's property.

█ The authority for prosecution of an inverse condemnation cause of action derives from article I, section 19 of the California Constitution, which states in relevant part: "Private property may be taken or damaged for a public use only . . . when just compensation . . . has first been paid to, or into court for, the owner." " 'The construction of the public improvement is a deliberate action of the state or its agency in furtherance of public purposes. If private property is damaged thereby the state or its agency must compensate the owner therefor [citations], whether the damage was intentional or the result of negligence on the part of the governmental agency.' [Citations.]" (*Albers v. County of Los Angeles* (1965) 62 Cal.2d 250, 258 [42 Cal.Rptr. 89, 398 P.2d 129] (*Albers*).)

In *Barham, supra*, 74 Cal.App.4th 744, the Fourth District held that Edison was liable under inverse condemnation in a situation very similar to the facts here. There, the plaintiffs' home was damaged by fire after high winds caused an Edison power line to break resulting in a wildfire.[2] (*Barham*, at p. 748.) As it does in this appeal, Edison argued that inverse condemnation should not

---

[2] At trial, the plaintiff homeowners prevailed against Edison on claims for negligence, nuisance and trespass, but not on their claim for inverse condemnation. (*Barham, supra*, 74 Cal.App.4th at p. 747.) On appeal, the court reversed the judgment on the inverse condemnation claim and affirmed as to the other claims. (*Id.* at pp. 747–748.) GTE California and California's Department of Forestry and Fire Protection also sued Edison for negligence and prevailed both at trial and on appeal. (*Id.* at p. 747.)

apply because it is a privately owned public utility—not a public entity—and cited to the Supreme Court's decision in *Breidert v. Southern Pac. Co.* (1964) 61 Cal.2d 659 [39 Cal.Rptr. 903, 394 P.2d 719] (*Breidert*). (*Barham, supra,* 74 Cal.App.4th at p. 752.) Edison urges that *Breidert* requires a private entity such as Edison to be a joint participant with a government entity in order to be subject to inverse condemnation liability. (See *Barham, supra,* 74 Cal.App.4th at p. 752.)

In *Breidert*, the defendant railroad and city closed a crossing depriving the plaintiffs of access to a right-of-way. (*Breidert, supra,* 61 Cal.2d at p. 661.) The closure was authorized by an order of the Public Utilities Commission. (*Breidert, supra,* 61 Cal.2d at p. 662.) The defendant railroad argued that it was "not a proper party defendant to the present action," an inverse condemnation case. (*Breidert, supra,* 61 Cal.2d at p. 662.) The Supreme Court simply noted that "[s]ince defendant railroad was an active joint participant in closing the crossing, it is a proper party to the present litigation. [Citations.]" (*Breidert, supra,* 61 Cal.2d at p. 662.) Like the *Barham* court, we do not believe the language of *Breidert* supports the interpretation that liability for inverse condemnation required coparticipation with a public entity. (*Barham, supra,* 74 Cal.App.4th at p. 752.) While joint participation may certainly give rise to inverse condemnation liability, we do not believe it is required.

Likewise we do not agree with Edison's overly narrow reading of *Pettis v. General Tel. Co.* (1967) 66 Cal.2d 503 [58 Cal.Rptr. 316, 426 P.2d 884]. Edison reads *Pettis* as involving a "narrow situation[]" "where the private entity takes or damages private property directly through the exercise of eminent domain power delegated to it by the Legislature."[3] In *Pettis*, the plaintiff landowner brought suit against two public utilities and his grantor to quiet title, to compel removal of utility lines and for trespass, and the defendant utilities argued that the plaintiff was not entitled to injunctive relief or to quiet title against them because his property had been put to a public use and the public interest had intervened. (66 Cal.2d at pp. 505, 507.) The Supreme Court agreed that if the defendants established at trial the necessity of maintaining their utility lines through the plaintiff's property, then the plaintiff would be "relegated to the remedy of damages as in inverse condemnation." (*Id.* at p. 507.) We do not read the language of *Pettis* as

---

[3] Public utilities, even though many are privately owned, are authorized to exercise the power of eminent domain. (11 Miller & Starr, Cal. Real Estate (3d ed. 2011) § 30A:6, p. 30A-12; see Pub. Util. Code, § 612 ["An electrical corporation may condemn any property necessary for the construction and maintenance of its electrical plant."].)

limiting a public utility's inverse condemnation liability to only situations involving the direct exercise of its eminent domain power.[4]

The *Barham* court found further support for its conclusion that Edison may be liable for inverse condemnation in the Supreme Court's decision in *Gay Law Students Assn. v. Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458 [156 Cal.Rptr. 14, 595 P.2d 592] (*Gay Law Students Assn.*). In *Gay Law Students Assn.*, the California Supreme Court held that the defendant, "a privately owned public utility, which enjoys a state-protected monopoly or quasi-monopoly," violates the California constitutional equal protection guarantee in article I, section 7 of the state Constitution, when it utilizes its authority arbitrarily to exclude a class of individuals from employment opportunities. (24 Cal.3d at p. 469.) The Supreme Court reasoned that the utility was "in many respects more akin to a governmental entity than to a purely private employer" and "the breadth and depth of governmental regulation of a public utility's business practices inextricably ties the state to a public utility's conduct, both in the public's perception and in the utility's day-to-day activities. [Citations]." (*Ibid.*) Of particular significance in this case is that "a public utility's monopolistic or quasi-monopolistic authority . . . derives directly from its exclusive franchise provided by the state." (*Id.* at p. 471; see Pub. Util. Code, § 6001 et seq.) A public utility's monopoly "is guaranteed and safeguarded by the state Public Utilities Commission, which possesses the power to refuse to issue certificates of public convenience and necessity to permit potential competition to enter" the market. (*Gay Law Students Assn., supra,* 24 Cal.3d at p. 471.)

In the instant appeal, we find that Edison's monopolistic or quasi-monopolistic authority, deriving directly from its exclusive franchise provided by the state (see *Gay Law Students Assn., supra,* 24 Cal.3d at p. 471), distinguishes Edison's action from the cases it cites rejecting inverse condemnation cases against private parties who do not have such monopolistic authority from the state. (See, e.g., *Bach v. County of Butte* (1989) 215 Cal.App.3d 294, 307 [263 Cal.Rptr. 565].)

---

[4] In contrast, in *Cantu v. Pacific Gas & Electric Co.* (1987) 189 Cal.App.3d 160, 164 [234 Cal.Rptr. 365], the Court of Appeal held that a public utility was not liable for inverse condemnation when its trench was a contributing cause to a landslide damaging the plaintiff's property where the trench was provided pursuant to a contract between the private developer and the utility, and therefore "no eminent domain rights were exercised . . ." and the public utility "did not pay for any franchise rights to use the street as it does to use public streets and highways." As the *Cantu* court reasoned, "where [the public utility] seeks to acquire property in eminent domain, it has made an economic business decision to assume liability in the event damage to neighboring property is proximately caused by its improvement. The same cannot be said in this case where the easement was granted by the private developer at no cost to [the utility]." (*Id.* at p. 165.) There is no indication from the record and Edison does not argue that its electrical facilities were placed pursuant to a private contract and grant of easement.

We find further support in *Eachus v. Los Angeles etc. Ry. Co.* (1894) 103 Cal. 614 [37 P. 750], a case cited in *Breidert, supra,* 61 Cal.2d 659 and by Edison as a joint participation case. *Eachus,* however, did not involve an issue of joint participation. Rather, like *Gay Law Students Assn.* the dispositive factor in *Eachus* appears to be the quasi-monopolistic authority and delegated power given to the defendant by the grant of a franchise. In *Eachus, supra,* 103 Cal. 614, the Supreme Court affirmed the award to the plaintiff landowners of inverse condemnation damages under the former takings clause of the California Constitution[5] against a defendant, a railway company that had "received a franchise from the city of Los Angeles to construct a railroad" along the street in front of the plaintiffs' property and, in preparation for construction of the railroad, excavated the middle of the street to its official grade and thereby cut off the plaintiffs' access to the street. (*Eachus, supra,* 103 Cal. at pp. 615–616.) The city apparently was not a defendant. (*Id.* at p. 614.)

"The term 'franchise' ordinarily refers to those services and functions that government itself is obligated to furnish to its citizens, and usually concerns matters of *vital* public interest such as water, gas, electricity, or telephone services, and the right to use the public streets and ways to bring them to the general public." (34A Cal.Jur.3d (2012) Franchises from Governmental Bodies, § 1.) Here, the government has chosen to grant a franchise and delegate the furnishing of electricity to Edison rather than operating the utility itself. Such a delegation does not remove the policy justifications underlying inverse condemnation liability: that individual property owners should not have to contribute disproportionately to the risks from public improvements made to benefit the community as a whole. (*Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 558 [253 Cal.Rptr. 693, 764 P.2d 1070] (*Belair*).) Edison argues that this loss-spreading rationale does not apply because as a public utility it does not have taxing authority and may raise rates only with the approval of California's Public Utilities Commission. We note that in this case the judgment was for $123,841.95 and that Edison has not pointed to any evidence to support its implication that the commission would not allow Edison adjustments to pass on damages liability during its periodic reviews.[6]

---

[5] "The constitution of 1879, article I, section 14, provides that: 'Private property shall not be taken or damaged for public use without just compensation having been first made to, or paid into, court for the owner.' " (*Eachus v. Los Angeles etc. Ry. Co., supra,* 103 Cal. at p. 616.)

[6] We also note that the Supreme Court has stated that, although the Legislature has chosen not to do so, nothing in the Constitution prevents the Legislature from placing municipally owned utilities under the regulations of the Public Utilities Commission, including regulation of rates. (*County of Inyo v. Public Utilities Com.* (1980) 26 Cal.3d 154, 156, 167 [161 Cal.Rptr. 172, 604 P.2d 566].) We do not believe such regulation would *immunize municipal utilities* from inverse condemnation liability under the theory that they were no longer able to spread the cost of public improvements.

■ As the *Barham* court noted, if we were to adopt Edison's position, "we would be required to differentiate between damage resulting from the operation of a utility based solely upon whether the utility is operated by a governmental entity or by a privately owned public utility" but we are "not convinced that any significant differences exist." (*Barham, supra*, 74 Cal.App.4th at p. 753.) For an owner whose property is damaged by the operation of a utility, he or she suffers a disproportionate share of the cost of the public improvement regardless of whether the utility is governmentally or privately owned. We do not believe the happenstance of which type of utility operates in an area should foreclose a property owner's right to just compensation under inverse condemnation for the damage, interest and attorney fees and should limit the property owner to traditional tort remedies. We therefore conclude that Edison may be liable for inverse condemnation and affirm the judgment.

## II. *A Reasonableness Standard for Inverse Condemnation Liability*

Relying on a series of decisions involving inverse condemnation claims arising from flood control projects, Edison next contends that, like the flood control context, "the application of inverse condemnation liability to a privately owned utility's operation of high voltage power lines implicates policy interests that are best balanced through application of a reasonableness standard." Under this reasonableness standard, Edison argues it is not liable. We find Edison's reliance on the flood control cases to be misplaced and we agree with the trial court that a strict liability standard applies to Edison's inverse condemnation liability.

The evolution of the Supreme Court's analysis of flood control project claims and the development of the reasonableness standard is summarized by the court in *Bunch v. Coachella Valley Water Dist.* (1997) 15 Cal.4th 432 [63 Cal.Rptr.2d 89, 935 P.2d 796] (*Bunch*). Beginning in *Albers, supra*, 62 Cal.2d 250, a non-flood-control case, the Supreme Court shifted the focus of inverse condemnation cases from common law to the Constitution and recognized two historical exceptions to the strict liability inverse condemnation rule: first, for damages a public entity inflicted in the proper exercise of police power and second, for damages in the unique context of water law. (*Bunch, supra*, 15 Cal.4th at pp. 440–441; *Albers, supra*, 62 Cal.2d at pp. 262–263.) Under this second exception, public entities were granted unqualified immunity from inverse condemnation liability for activity that was privileged at common law such as under the "common enemy" doctrine which granted private landowners the privilege of improving their property from external hazards such as floodwaters along a natural watercourse across the property. (*Bunch, supra*, 15 Cal.4th at pp. 440–441; *Belair, supra*, 47 Cal.3d at pp. 563–564.)

In *Belair, supra,* 47 Cal.3d 550, the Supreme Court reconciled the constitutional principles of *Albers, supra,* 62 Cal.2d 250, with the unique problems of flood control litigation by concluding that a "reasonableness" rule best balanced the competing concerns that a public entity undertaking flood control projects not be made the absolute insurer of those lands provided protection against the potentially enormous damage of a defective public flood control project. (*Bunch, supra,* 15 Cal.4th at pp. 442–443; *Belair, supra,* 47 Cal.3d at pp. 565–566.) *Belair* emphasized that the "reasonableness" rule would not discourage beneficial flood control projects, while allowing compensation for property that those projects unfairly damaged. (*Bunch, supra,* 15 Cal.4th at p. 443; *Belair, supra,* 47 Cal.3d at p. 565.)

Then in *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327 [27 Cal.Rptr.2d 613, 867 P.2d 724] (*Locklin*), the Supreme Court applied *Belair*'s flood control reasonableness rule beyond merely improving property along a natural watercourse to the broader context of a public entity deliberately draining excess surface water into a natural watercourse (causing damage downstream). (*Bunch, supra,* 15 Cal.4th at pp. 444–445; *Locklin, supra,* 7 Cal.4th at p. 367.) The *Locklin* court also articulated factors that could be used in balancing the interests of riparian landowners and assessing reasonableness in inverse condemnation actions. (*Bunch, supra,* 15 Cal.4th at pp. 445–446; *Locklin, supra,* 7 Cal.4th at pp. 368–369.)

■ Finally, in *Bunch, supra,* 15 Cal.4th 432, the Supreme Court extended the flood control reasonableness rule beyond improvements along a natural watercourse to where a public entity diverts and rechannels water under a flood control system of dikes and levees that fail and cause damage to properties historically subject to flooding. (*Bunch, supra,* 15 Cal.4th at p. 447.) The *Bunch* court recognized the inherent balancing of interests and risks in the placement, design and construction of even the most effective flood control system and noted that whatever choice was made would necessarily affect the patterns of flooding in the event the project failed, thereby increasing some risks in order to reduce others. (*Bunch, supra,* 15 Cal.4th at p. 450.) While the danger to individual lands from the failure of a project is potentially enormous, strict and open-ended liability for the failure of a project whose overall design, construction, operation and maintenance was "reasonable" would, the *Bunch* court believed, "unduly deter the development of these vital bulwarks against common disaster." (*Bunch, supra,* 15 Cal.4th at p. 450; see *Belair, supra,* 47 Cal.3d at p. 565.) Thus *Bunch* concluded that the only way to determine whether a damaged private owner of land subject to historical periodic flooding has been forced by the failure of a flood control system "to contribute a compensable 'disproportionate' share of the public undertaking is to determine whether the system, as

designed, constructed, operated, and maintained, exposed him to an 'unreasonable' risk of harm, either individually or in relation to other landowners." (*Bunch, supra,* 15 Cal.4th at p. 450.)

While Edison argues that "the Supreme Court has determined a reasonableness test should be applied in lieu of a strict liability standard to better balance the policy interests at stake," there is no indication from these cases that the Supreme Court intended to replace the strict liability standard in inverse condemnation cases with a reasonableness test outside the flood control context. The language of the flood control cases highlights the unique policy concerns relevant to a "common enemy" or natural disaster that threatens property even without the existence of a public improvement. In contrast, here it is the public improvement, not nature, that creates the risk of disaster.

Indeed, at least one Court of Appeal has already rejected an attempt to extend the *Belair-Locklin-Bunch* reasonableness standard outside the flood control context for this reason. In *Pacific Bell v. City of San Diego* (2000) 81 Cal.App.4th 596 [96 Cal.Rptr.2d 897], the plaintiff brought suit for inverse condemnation for damage from a burst pipe in the defendant city's water delivery system. The defendant city argued that when private property is damaged by water flooding from a public improvement the Supreme Court in the *Belair-Locklin-Bunch* cases "supplanted the ordinary rule of strict liability with a rule of unreasonableness in constructing or maintaining the public improvement." (*Pacific Bell, supra,* 81 Cal.App.4th at p. 610.) In rejecting the argument, the court in *Pacific Bell v. City of San Diego* reasoned that "[u]nlike flood control improvements, the purpose of a water delivery system is not to protect against the very injury that its failure caused. Unlike flood control improvements, failure of the pipe here subjected Pacific Bell's facility to injury from flooding that was not a risk it was exposed to in the absence of the pipe. Thus, the private landowner damaged by failure of the pipe, if left uncompensated, is forced to contribute a disproportionate share of the public undertaking. Because damages caused by failure of a water delivery system do not resemble damages caused by failure of a flood control system, we conclude the *Belair, Locklin* and *Bunch* reasonableness test should not be extended to the facts of this case, and the ordinary rules of inverse condemnation strict liability for damages caused by public improvements are applicable." (*Pacific Bell, supra,* 81 Cal.App.4th at pp. 614–615, fn. omitted.)

We agree with the reasoning in *Pacific Bell* and conclude that the "concerns that animated the rejection of the strict liability rule in the context of public flood control projects has no counterpart here" where the risk to Pacific Bell's facility of injury from ground faults was not a risk it was

exposed to in the absence of Edison's electrical facility. (*Pacific Bell v. City of San Diego, supra*, 81 Cal.App.4th at p. 614.)[7]

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to Pacific Bell.

Mallano, P. J., and Johnson, J., concurred.

On September 13, 2012, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied November 14, 2012, S205855. Baxter, J., and Werdegar, J., did not participate therein.

---

[7] Edison also argues that a "rule of reasonableness provides a close approximation of the ordinary duty or care imposed by tort law on privately-owned utilities' operation of high voltage electrical lines and, therefore, respects the allocation of risk established for these activities by California courts," referring to *White v. Southern Cal. Edison Co.*(1994) 25 Cal.App.4th 442 [30 Cal.Rptr.2d 431] and other cases. As the Supreme Court has explained, "*Albers* ' "rejected the notion that there need be a congruence between public and private liability in inverse condemnation actions." ' [Citation.] The *Albers* court made it clear that its liability rule did not derive from statutory or common law tort doctrine, but instead rested on the constitutional requirement of just compensation." (*Bunch, supra*, 15 Cal.4th at p. 440.)