[Civ. No. 38449. Second Dist., Div. Four. Dec. 6, 1972.]

PACIFIC GAS & ELECTRIC COMPANY, Plaintiff and Respondent, v.
MEDA PARACHINI, as Co-trustee, etc., et al.,
Defendants and Appellants.

**COUNSEL**

Ogle & Gallo, Charles E. Ogle and Gerald Mason for Defendants and Appellants.

Frederick T. Searles, Charles T. Van Deusen, Arthur L. Hillman, Jr., Charles W. Thissell, Sanford M. Skaggs and Muller, Woolpert & McWhinney for Plaintiff and Respondent.

**OPINION**

**FILES, P. J.**—This eminent domain proceeding was brought to acquire an easement 350 feet in width across defendants' cattle ranch for two 500 kilovolt transmission lines, on a route between the Diablo Canyon generating site in San Luis Obispo County and the Gates substation near Coalinga. After a jury trial, a judgment was entered on August 7, 1970 that plaintiff was entitled to take the easement upon payment of $30,800 to defendants. A final order of condemnation was entered the same day. Defendants are appealing from both the judgment and the order.

Defendants' first two contentions are that the trial court lacked jurisdiction, and that plaintiff failed to prove necessity for the taking. Some background is necessary to put these arguments into context.

On December 23, 1966, plaintiff applied to the Public Utilities Commission of California for a certificate of public convenience and necessity under section 1001 of the Public Utilities Code to construct and operate a nuclear fueled power plant at a site in Diablo Canyon. Hearings were held on this application and, on November 7, 1967, the Commission handed down its decision No. 73278, containing an interim order that a certificate issue to construct and operate a nuclear fueled power generating unit of approximately 1,060,000 kilowatts capacity, together with appurtenant facilities and transmission lines as described in that proceeding. In its decision, the commission noted that plaintiff contemplated eventual installation of six generating units in the same locality, and the commission approved the construction of an intake structure to handle cooling water for three units. The switchyard area, as shown in the plan which the commission approved, was sized to accommodate six units. The approved plan included a single 500 kv transmission line to Gates and another to Midway substation. The commission observed, "The two lines would handle somewhat more than the output of the proposed unit but an additional circuit would be required upon construction of a second generating unit at the site."

On February 16, 1968, plaintiff filed an application with the commission for a certificate to construct and operate a second nuclear fueled power plant at Diablo Canyon. After investigation and a public hearing, this application was granted by an interim order on March 25, 1969, in decision No. 75471. The decision again noted that plaintiff was looking ahead to a possible total of six units.

On January 27, 1970, the commission undertook an investigation looking towards the issuance of a general order to protect the environment and carry out the commission's other responsibilities in connection with the planning and construction of facilities for generating and transmitting electricity. This investigation culminated in the commission's decision No. 77301, issued June 3, 1970, which adopted General Order No. 131. This order provides, among other things, that no regulated utility shall begin construction of overhead line facilities designed for voltage in excess of 200 kilovolts without the commission's first having found, after consideration of the environmental impact, that the facilities are required by the public convenience and necessity. The order further establishes procedures for hearings, and standards for the issuance of the certificates required under that order.

The complaint in this eminent domain proceeding was filed January 29, 1969.

When this case was called for trial on June 8, 1970, counsel for defendants informed the court that a complaint was about to be filed with the Public Utilities Commission asking that the route of the transmission line be changed. He requested the court to continue the trial until after the commission had reached a decision on that complaint. Plaintiff opposed a continuance and the trial court denied it. The trial then went forward.

On June 8, 1970, Mary Hartzell, one of the defendants, filed with the Public Utilities Commission a complaint requesting the commission to (a) issue a temporary order restraining plaintiff from proceeding with right-of-way acquisition along the Diablo-Gates route, (b) undertake a study of alternate routes, and (c) select an alternate and prohibit plaintiff permanently from constructing on the route which had theretofore been selected.

## Jurisdiction

It is now defendants' contention that the filing of the complaint before the Public Utilities Commission on June 8, 1970, divested the superior court of jurisdiction in this eminent domain proceeding. Defendants' counsel cites no cases for that proposition, but relies generally upon the statutes which prohibit a utility from constructing a facility without a certificate from the commission (Pub. Util. Code, § 1001) and which forbid any court other than the Supreme Court to interfere with the commission in the performance of its duties (Pub. Util. Code, § 1759). There is no indication that the commission ever issued the restraining order which defendant Hartzell requested.

The acquisition of property through the power of eminent domain and the construction of facilities thereon are distinct functions. The acquisition of property by a public utility does not necessarily interfere with the exercise of the commission's authority to determine what shall be built and where. We must reject the bald proposition that a defendant in an eminent domain proceeding may, at will, oust the court of jurisdiction by the simple act of filing a petition with the commission.[1]

## Necessity to the Proposed Public Use

The trial commenced with testimony as to the necessity for taking the easement. The sole witness on that subject was a consulting electrical engi-

---

[1]See Public Utilities Code section 1702, authorizing the filing of a complaint "by any corporation or person."

neer, a retired employee of plaintiff. The witness described generally the projected need for additional generating facilities in California over the next decade, plaintiff's plans for the Diablo Canyon development, and the manner in which the electricity generated there would be transmitted through the Gates substation for connection with the Pacific Northwest-Pacific Southwest intertie system. He testified that the Public Utilities Commission had approved in principle the proposed construction of six generating units at Diablo Canyon, that both the Public Utilities Commission and the Atomic Energy Commission had specifically approved the first unit, which was then under construction, that the Public Utilities Commission had approved the second; and that the application before the Atomic Energy Commission for the second unit was pending.[2] He explained that an easement 200 feet wide would be necessary for a single transmission line (which had been approved by the Public Utilities Commission in 1967), but 350 feet would be required to accommodate two parallel 500 kilovolt lines. The second line to Gates would be necessary when the third generating unit began to operate, which the witness estimated would be in 1975 or 1976.

Defendants offered no evidence to contradict or impeach this testimony. The trial court thereupon made its finding that the taking of the easement was necessary for a public use.

Defendants' attack here upon the sufficiency of the evidence focuses upon the second line, and the claimed necessity for a 350-foot easement rather than the 200 feet which would suffice for the single line which the Public Utilities Commission had theretofore expressly authorized.

Section 1241 of the Code of Civil Procedure establishes two prerequisites to the taking of property by eminent domain. First, it must appear that the property is to be applied to a use authorized by law. Electric power lines for the transmission and distribution of electrical energy are such a use. (Code Civ. Proc., § 1238, subd. 13.) Second, it must appear that the taking of the property is necessary to the public use. In determining this issue, the court is entitled to consider not only present needs, but those which can be fairly anticipated on account of future growth. (*Central Pacific Ry. Co.* v. *Feldman* (1907) 152 Cal. 303, 309 [92 P. 849]; *Spring Valley Water Works* v. *Drinkhouse* (1891) 92 Cal. 528, 532 [28 P. 681];[3] *Los Angeles County Flood Control Dist.* v. *Jan* (1957) 154 Cal.App.

---

[2] The Public Utilities Commission ordered a certificate to issue for construction of the first unit November 7, 1967, by its decision No. 73278, and ordered a certificate to issue for construction of the second unit March 25, 1969, by its decision No. 75471.

[3] Overruled on another point in *County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 680 [312 P.2d 680].

2d 389 [316 P.2d 25].)[4] ■ The uncontradicted testimony of plaintiff's witness adequately supported the trial court's finding of necessity for the 350-foot easement.

■ Whether a use can be "fairly anticipated" is essentially a factual issue, and must depend upon a variety of circumstances. The trial court was entitled to consider that this easement is to be used for one segment of a complex system for generating and transmitting electricity, arrangements for which must be made farther ahead than for a simpler type of use. Land acquisition necessarily precedes construction, and eminent domain proceedings must be commenced far enough in advance that the case can be tried and brought to final judgment by the time the utility needs to start construction on that property. Necessarily, a utility must project its needs far enough ahead to allow for the delay caused by the appellate process.[5] Though a trial court may authorize the condemner to take possession of the property pending appeal (Code Civ. Proc., § 1254, subd. (b)) a court could reasonably assume that a condemner would not spend millions of dollars in the construction of a transmission line over that property until the judgment had become final.

In deciding whether the evidence showed that plaintiff "fairly anticipated" the need for 150 feet of extra width to accommodate the second transmission line the trial court was entitled to consider these additional circumstances shown by the record: Plaintiff had definitely projected the construction of six generating units at Diablo Canyon. This projection had been disclosed to the Public Utilities Commission which, as of June, 1970, had authorized construction of two generating units, an intake structure for three units, and a switchyard area for six. The expected need for power would require the third unit in 1975 or 1976. Since the third generator would be in the same location as the first two, and since the second transmission line would parallel the first, there was every reason to expect that the regulatory agencies would approve construction of the additional generator and line as the need for additional power approached.

The trial court was also entitled to consider the saving in time and expense to plaintiff, defendants, and the courts in condemning the 350-foot

---

[4]Disapproved on another point in *People* v. *Chevalier* (1959) 52 Cal.2d 299, 305-307 [340 P.2d 598].

[5]The history of the present case is instructive. The judgment cannot reach finality within four years after the action was filed. At that rate, a new proceeding filed now would not be completed before the date when, according to the evidence, plaintiff needs to use both lines.

width in a single proceeding. If only a portion of the easement was to be built upon at first, this fact would impose no additional hardship on defendants.

This is not a case like *San Diego Gas & Electric Co.* v. *Lux Land Co.* (1961) 194 Cal.App.2d 472, 480 [14 Cal.Rptr. 899], where a utility was seeking a wider easement "only to cover the possibility of a need therefor some time in the future." Here the showing of need was specific, as a part of a project then under construction, to be enlarged systematically in response to a recognized demand for service.

Contrary to defendants' view, a certificate from the Public Utilities Commission is not a condition precedent to the acquisition of property by a regulated utility. As the history of this case illustrates, four years or more may elapse between the filing of a complaint and a final judgment in a right-of-way case. The Public Utilities Commission may not wish to commit itself by the issuance of a certificate of public convenience and necessity so far in advance of actual construction. Rather, the commission may prefer to base its decision upon economic, technological and environmental circumstances as they appear closer to the time of construction.[6]

The Public Utilities Commission of California has taken the position that it does not wish to issue certificates before rights of way are acquired. In its decision No. 77301 (discussed *supra*), the commission said: "The Sierra Club observes that the utility should not obtain future easements and then present the commission with an application for transmission line certification. It must be recognized, however, that long-term planning may require acquisition of easements well in advance of need. Certification of rights of way or easements does not appear to be desirable.

"It is incumbent upon the utility to exercise provident care when transmission line certification occurs after obtaining easements. The utility will not only have the burden of seeking new easements where a different route is deemed appropriate by the Commission, but also of meeting the prudent expenditure test for the existing easements in rate proceedings before the Commission."

There is no authority for the suggestion that, as a matter of law, plaintiff

---

[6]For example, plaintiff's expert, testifying in this case in 1970, could not predict the size of generating unit number 3. He said units 1 and 2, then certificated by the Public Utilities Commission would each produce 1,060 megawatts, the largest capacity in the United States, but that advancing technology would probably allow subsequent units of at least 1,500 megawatts capacity.

may not take the additional 150 feet needed for the second transmission line until it has a certificate to construct the third generating unit. Such a rule of law could have the most unfortunate practical consequences. Since the generator and the line are to be used together, the line ought to be in place when the generator begins to operate. If the utility were to commence construction of the generator promptly after certification, it might find itself with a completed but idle generator before it had obtained a right-of-way. If it did not start to build the generator until it had obtained a final judgment against the last litigious property owner on the route, the generator would not be constructed until many years after the Public Utilities Commission had decided that public convenience and necessity required it. Neither alternative would serve the public interest.

### Other Contentions

Defendants have argued several other points which are not grounds of reversal, and which require only brief mention here.

It was not an abuse of discretion for the trial court to allow an expert witness for plaintiff to use "Sale C" as a comparable sale in explaining his opinion as to value. (See *People* ex rel. *Dept. of Public Works* v. *Wasserman* (1966) 240 Cal.App.2d 716, 737, 739 [50 Cal.Rptr. 95].)

The jury's finding that there was no severance damage is supported by the testimony of plaintiff's appraisal witness. He explained that the highest and best use of the property for the foreseeable future was as a cattle ranch, and that in his experience power lines do not affect the market value of the remainder of such property. He also said that the property had "investment potential" in that a buyer may sometimes pay more for a ranch than its current income would justify in the hope that an increase in cattle prices or other circumstances would bring an increase in land values. Contrary to defendants' contention, the witness did not say that the property had investment value for potential subdivision.

An instruction given by the court on severance damage (BAJI No. 11.86) is not contradictory of the instruction defining market value (BAJI No. 11.73).

It was not error for the trial court on two occasions to sustain objections and admonish the jury to disregard statements made by defendants' counsel in argument.

It was not an abuse of discretion for the trial court to refuse to

receive defendants' offer of evidence of sales identified as numbers 6, 6A and 7 after defendants' counsel had stated "we have not offered 6, 6A or 7 as comparable sales. . . ." (See Evid. Code, § 816.) No other basis of admissibility has been shown.

It was not an abuse of discretion for the trial court to allow plaintiff's valuation witness to show to the jury a chart, marked 13 for identification. This chart, which was prepared under the direction of the witness, was simply a visual presentation of some figures which he discussed in his testimony concerning a population study made by the local school district. The testimony was received without objection, and the chart was not received in evidence.

The judgment and order are affirmed.

Jefferson, J., concurred.

**KINGSLEY, J.**—I concur in the judgment in this case, on the facts shown by the record before us; but I think it should be clear that to allow condemnation of a right-of-way on the showing of potential public use herein made is not to say that condemnation of a greater interest in land should be allowed on the same kind of showing.

The history of approval of atomic generating units is not such as to make me as sanguine as my colleagues that the next (third) unit will be approved. But the trial court has held, on facts not here open to question, that the land is fundamentally ranch land. That being so, an unused easement should cause the defendants only minimal damage—damage which, on this record, the trial court could find was off-set by the public benefit. This case stands for no more; on that basis I concur in the judgment of affirmance.

Appellants' petition for a hearing by the Supreme Court was denied March 1, 1973. Tobriner, J., did not participate therein. Mosk, J., was of the opinion that the petition should be granted.

On June 20, 1973, the Supreme Court granted appellants' petition for hearing following the Court of Appeal's denial of a motion to recall its remittitur and the matter was transferred to the Supreme Court and retransferred to the Court of Appeal with directions to recall its remittitur and to award costs on appeal to appellants.