[No. A028889. First Dist., Div. Five. Feb. 9, 1987.]

RICHARD A. CANTU et al., Plaintiffs and Respondents, v.
PACIFIC GAS AND ELECTRIC COMPANY, Defendant and Appellant.

COUNSEL

Robert L. Bordon, Robert R. Rickett, Richard L. Meiss and Donald Erickson for Defendant and Appellant.

Robert S. Sturges and Caputo, Liccardo, Rossi, Sturges & McNeil for Plaintiffs and Respondents.

OPINION

LOW, P. J.—When a public utility does not exercise eminent domain powers to extend a line to serve customers, the right to sue in inverse

condemnation does not exist if damage results from the extension. However, other legal remedies may be timely asserted if there are defects in the extension which proximately result in damage and were caused by the utility.

I

Plaintiffs Richard and Shirley Cantu sued Pacific Gas and Electric Company (PG&E) for damages to their residence, alleging inverse condemnation, trespass and nuisance. The trial court found defendant inversely liable and directed the jury to determine damages. The jury found for defendant on the trespass and nuisance causes of action and returned a verdict of no damages for plaintiffs. The plaintiffs filed a motion for a new trial on the ground of inadequate damages, which was granted. Defendant appeals from the judgment, contending (1) it was not operating as a public entity and the court erred in finding it was inversely liable; (2) the court erred in rejecting the comparative negligence defense; and (3) the court abused its discretion in granting the motion for new trial. We reverse.

In 1975, plaintiffs constructed a hillside residence on Maya Way in Los Gatos Hills. The subdivision containing plaintiffs' lot was developed in 1969 and even then was known to be a geologically unstable area. In 1967, a geological report (the Gribaldo Report) was prepared as part of the state's subdivision approval process. It noted that the area, and particularly plaintiffs' lot, rested on top of a landslide area and it cautioned that any appreciable cutting or filling of the natural slopes in the area would "undoubtedly accelerate creeping and progressive failure of the slopes." The report indicated that plaintiffs' lot was among several lots that deserved special consideration due to the unstable soil conditions. The report recommended stabilization of the natural slopes and a more detailed investigation to be undertaken before construction began on plaintiffs' lot. In 1968, the California Division of Real Estate issued its final subdivision public report which warned prospective purchasers that certain parcels may be unstable and a detailed inspection should be made before deciding to build.

Plaintiffs received both reports prior to the purchase of their lot. The lot rested on compacted fill. Plaintiffs undertook no further soils investigation and made no attempt to stabilize the lot before construction began. This, even after a 1974 topological map indicated that some soil had already moved since the preparation of the Gribaldo Report seven years earlier. Plaintiffs' house totaled 2,630 square feet and was built on wooden poles reinforced with concrete and buried into the hillside. The house was designed by an architect aided by a structural engineer and a soils engineer.

Before any lots were sold, PG&E contracted with the developers of the subdivision to extend gas and electric service to the 16 lots within the subdi-

vision. As a result, PG&E installed an 18-inch-wide joint trench for its gas and electric facilities together with telephone equipment owned by General Telephone Company of California. The trench was installed six feet beneath the street surface adjacent to Maya Way, a private road, which was at all times the property of the Montezuma Hills Road Association. The roadway and the trench were built on a fill above the plaintiffs' house, about four feet from their property line. The trench was backfilled according to local requirements.

During the winter of 1980-1981, heavy rains saturated the hillside on which plaintiffs built their house. In March, the slope began to move, twisting the house on its foundation. By May, large sections of the hillside collapsed, making the house uninhabitable. First, plaintiffs noticed that the road above their house began to buckle, which became progressively worse. A fracture developed in the road which ultimately exposed the trench. Finally, the hillside gave way. Plaintiffs and the homeowners association hired K. P. Nordmo, a soils engineer, who testified that the slide was primarily caused by (1) water which collected in the roadfill, which then seeped into the subsoil, and (2) weak topsoil. He concluded that the PG&E trench conducted water to the slope and was a contributing cause of the landslide.

Plaintiffs rebuilt their house on a steel foundation, installed a buttress at the lower end of the lot and added 170 square feet of living area to the house. PG&E relocated its facilities to the other side of the road.

The issue of inverse liability was tried to the court. In finding PG&E inversely liable, the trial court rejected as inapplicable defendant's affirmative defense of comparative negligence.

## II

Defendant is a public utility with limited eminent domain powers. Under proper circumstances, defendant company may appropriate private property when necessary to further a public use. (Code Civ. Proc., §§ 1240.010, 1240.030; see *Pettis* v. *General Tel. Co.* (1967) 66 Cal.2d 503, 507 [58 Cal.Rptr. 316, 426 P.2d 884]; *Pacific Gas & Electric Co.* v. *Hay* (1977) 68 Cal.App.3d 905, 911 [137 Cal.Rptr. 613]; *Pacific Gas & Electric Co.* v. *Parachini* (1972) 29 Cal.App.3d 159, 164-165 [105 Cal.Rptr. 477].) ■ Whether the installation of the trench for line extension service is a public use is a question of law and, as a reviewing court, we are not bound by the trial court's determination. (See *Breidert* v. *Southern Pac. Co.* (1964) 61 Cal.2d 659, 662 [39 Cal.Rptr. 903, 394 P.2d 719]; *People* v. *Chevalier* (1959) 52 Cal.2d 299, 304-305 [340 P.2d 598].)

In support of its contention that this was a private project, PG&E relies on the facts that the service was provided pursuant to a contract between the private developer and defendant, that no eminent domain rights were exercised and that PG&E did not pay for any franchise rights to use the street as it does to use public streets and highways. ■ Public use is defined as "a use which concerns the whole community or promotes the general interest in its relation to any legitimate object of government. [Citation.]" (*Bauer* v. *County of Ventura* (1955) 45 Cal.2d 276, 284 [289 P.2d 1].) The *Bauer* court concluded that the taking of private property for construction of storm drainage systems is a taking for a public use. (*Ibid.*; see also *Pettis* v. *General Tel. Co., supra,* 66 Cal.2d 503 [maintenance of underground utility lines is a public use]; *Slemons* v. *Southern Cal. Edison Co.* (1967) 252 Cal.App.2d 1022 [60 Cal.Rptr. 785] [utility poles and lines are devoted to public use].)

■ In fact, Civil Code section 1001 provides a private right of eminent domain to acquire an easement to provide utility service defined as "water, gas, electric, drainage, sewer, or telephone service." This is tantamount to a legislative declaration that such use is a public use. (See Code Civ. Proc., § 1240.010.) Thus, generally speaking, the condemnation of private property to install lines for the transmission and distribution of electricity is a public use, to which inverse liability principles apply. (See *Pettis* v. *General Tel. Co., supra,* 66 Cal.2d at p. 507.) ■ But, as we discuss below, the line extension service provided here is for a private use and therefore inverse liability principles are inapplicable.

The joint trench installed by defendant was designed to furnish electrical service to interruptible customers in the development, including the Cantus. The installation was accomplished pursuant to PG&E rule 15, which provides in pertinent part: "A. General [¶] The Utility will construct, own, operate and maintain lines only along public streets, roads and highways which the utility has the legal right to occupy, *and on public lands and private property across which rights of way satisfactory to the utility may be obtained without cost or condemnation by the utility.*" (Italics added.)

Pursuant to its own rules, authorized by the Public Utilities Commission (Pub. Utilities Code, § 761), PG&E will not proceed to condemn private property to furnish line extensions. This is evidence of the uniquely private nature of this service. The trench installed here was designed to fulfill an individual need. This is unlike the construction of permanent transmission towers or power lines (see *Pacific Gas & Electric Co.* v. *Parachini, supra,* 29 Cal.App.3d 159; *Pacific Gas & Electric Co.* v. *Hay, supra,* 68 Cal.App.3d 905), or telephone poles (see *Slemons* v. *Southern Cal. Edison Co., supra,* 252 Cal.App.2d 1022) which are designed to transmit electricity over a much greater area and which would exist even if these particular plaintiffs were

not customers. In this case, the trench was installed specifically to furnish electrical service for plaintiffs and their neighbors.

PG&E did not need prior governmental approval or a declaration of necessity to construct the trench, as is required when the utility seeks to condemn land in eminent domain proceedings. (See Code Civ. Proc., §§ 1240.030, 1240.040; *People* v. *Chevalier, supra,* 52 Cal.2d at p. 304; *Pacific Gas & Electric Co.* v. *Hay, supra,* 68 Cal.App.3d at pp. 910-911; *Pacific Gas & Electric Co.* v. *Parachini, supra,* 29 Cal.App.3d at p. 164.) We view this as further indication that the service provided did not benefit the public at large but was for the private use of the plaintiffs and their neighbors. "The law of inverse condemnation, viewed broadly and in perspective, seeks to identify the extent to which otherwise uncompensated private losses attributable to governmental activity should be socialized and distributed over the taxpayers at large rather than be borne by the injured individual." (Van Alstyne, *Statutory Modification of Inverse Condemnation: The Scope of Legislative Power* (1967) 19 Stan.L.Rev. 727, 738.) The running of line extensions to plaintiffs' residence is not the type of public or quasi-public activity where the risks of injury should be spread over society. This project does not benefit the public at large. Imposing inverse liability in this case, where PG&E did not first act to condemn the property, would be unfair. In those instances where PG&E seeks to acquire property in eminent domain, it has made an economic business decision to assume liability in the event damage to neighboring property is proximately caused by its improvement. The same cannot be said in this case where the easement was granted by the private developer at no cost to PG&E.

Further, we have found no case imposing inverse liability upon a public utility which did not first acquire the easement through legislative action or by eminent domain or where the utility did not act jointly with a governmental entity. (See *Pettis* v. *General Tel. Co., supra,* 66 Cal.2d at pp. 505-506; *Breidert* v. *Southern Pac. Co., supra,* 61 Cal.2d at p. 662; *Kachadoorian* v. *Calwa County Water Dist.* (1979) 96 Cal.App.3d 741, 749 [158 Cal.Rptr. 223]; also *City of Los Angeles* v. *Japan Air Lines Co., Ltd.* (1974) 41 Cal.App.3d 416, 428-430 [116 Cal.Rptr. 69].) The public utility's right to acquire private land through eminent domain is a specific legislative grant and the scope of benefits and liabilities thereunder should be limited to those areas clearly implicated. The service provided by defendant extended only to 16 homes in the development. The connection from these homes to a distribution line is a private service to which eminent domain and inverse liability principles do not apply.

By our holding, PG&E is not immune from liability for damages caused by a defectively designed trench. Plaintiffs could have alleged a count for

negligence in the complaint filed herein. Although inverse liability and negligence spring from different bodies of law, they often overlap. (See *Granone v. County of Los Angeles* (1965) 231 Cal.App.2d 629, 648-649 [42 Cal.Rptr. 34]; Van Alstyne, *Statutory Modification of Inverse Condemnation: The Scope of Legislative Power, supra,* 19 Stan.L.Rev. at pp. 738-742.) Accordingly, we hold the trial court erred in finding PG&E inversely liable. In light of our ruling, there is no need for a retrial on the issue of damages and we do not need to address defendant's argument concerning the comparative negligence defense.

The judgment finding PG&E inversely liable and the order granting a new trial are reversed. The superior court is directed to enter judgment for defendant.

King, J., and Haning, J., concurred.