Filed 11/16/21; Certified for Publication 12/9/21 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| FOLEY INVESTMENTS, L.P., | D079045 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 17CV002074) |
| ALISAL WATER CORPORATION, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of Monterey County, Susan J. Matcham and Marla O. Anderson, Judges. Affirmed.

Noland, Hamerly, Etienne & Hoss and Michael Masuda for Plaintiff and Appellant.

Law Offices of John A. Biard, Steven R. Myers and William P. Schneider for Defendant and Respondent.

Foley Investments, LP (Owner) asserted inverse condemnation and tort claims against Alisal Water Corporation dba Alco Water Service (Alco) after an Alco-owned water main that runs through a portion of Owner's apartment complex repeatedly ruptured. In the first phase of a bifurcated bench trial, the court ruled against Owner on its inverse condemnation claim. The court

found the water main did not serve a "public use" for inverse condemnation purposes because Alco installed the main under a private contract with Owner's predecessor for the sole benefit of the subject property. In the second phase, the court found the tort claims were barred by "fire protection" immunity (Pub. Util. Code, § 774)[1] because Alco constructed and maintained the main on the subject property in a particular way to meet the property's particular fire protection needs. The court entered judgment in Alco's favor.

On appeal, Owner contends the trial court erred by finding the water main does not serve a public use for purposes of the inverse condemnation claim, and by finding fire protection immunity bars the tort claims. As we will explain, based on the historical facts as found by the trial court, we find no error and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The Santana Apartments are a residential apartment complex located at 1235 Garner Avenue (the Property) in Salinas. Alco provides water service to the Property via a 12-inch main (the Santana main).

In 2017, Owner filed a lawsuit against Alco alleging the Santana main ruptured in 2015 and 2016, causing extensive damage to the Santana Apartments. Owner asserted claims for inverse condemnation, nuisance, trespass, and negligence. A few months after filing suit, Owner amended its complaint to allege the Santana main had since ruptured a third time.

By stipulation, the trial court bifurcated the trial. In phase 1, the court would decide the "public use" element of Owner's inverse condemnation

---

[1] Public Utilities Code section 774 states in part: "No water corporation which has undertaken to provide fire protection service . . . shall be liable for any . . . damage to or loss of property resulting from a failure to . . . maintain . . . any equipment or other fire protection facility or service." Further undesignated statutory references are to the Public Utilities Code.

2

claim.  If the court found the Santana main served a public use, Owner would dismiss its remaining tort claims and phase 2 would consist of a jury trial solely on inverse condemnation damages.  If, however, the court found the Santana main did not serve a public use, the court would dismiss the inverse condemnation claim and phase 2 would consist of a jury trial on Owner's remaining tort claims.

## *Phase 1 Trial*

### *Evidence*

During the phase 1 trial, Owner's general partner and an engineering expert testified on Owner's behalf, and Alco's president and an engineering expert testified on Alco's behalf.  We set forth their testimony in the light most favorable to the judgment.  (See *Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1554 ["we defer to the express or implied factual findings of the trial court"].)

Alco is a privately owned water company regulated by the Public Utilities Commission (PUC).  It serves about 9,000 metered service connections in the eastern portion of Salinas.  Alco obtains its water from underground wells, and distributes it through a system of interconnected water mains located primarily under city streets.

Alco's usual practice for providing water service to a property is to run a service line from an Alco main to a meter at the property's boundary, from which point the property owner is responsible for installing and maintaining service lines to the property.

In 1986, before the Property was developed, Alco installed an underground well and pump within an exclusive easement toward the eastern boundary of the Property.  Alco connected the well to a main beneath Cortez Street (the Cortez main), located east of the Property.

3

In late 1986, the Property's prior owner (Developer) began developing the Santana Apartments on the Property. The fire marshal required that Developer install two fire hydrants on interior portions of the Property. Developer and Alco entered into a "main extension contract" under which Alco agreed to install the Santana main on the Property to meet the fire hydrants' minimum flow requirements. Developer designed the Santana main, with input from Alco. Alco's president testified that, but for Developer's particular needs vis-à-vis the fire hydrants, Alco would not have installed the Santana main on the Property. Instead, Alco would have followed its usual practice of providing water service to the boundary line, as Alco had done for neighboring apartment complexes. Developer granted Alco easements for the Santana main over the Property; Alco did not take the land by eminent domain.

The Santana main originates at an Alco main beneath Garner Avenue (the Garner main) to the west of the Property, and terminates at a "gate valve" within Alco's well easement on the eastern end of the Property. The other side of the gate valve connects to Alco's well and the Cortez main via a smaller 10-inch pipe. Alco's president and engineering expert acknowledged that if the gate valve were opened, water would flow between the Garner main and Cortez main—and throughout Alco's entire distribution system. And an Alco map of its distribution system appears to show the Garner main and Cortez main connecting via the Santana main and gate valve. This configuration led Owner's expert to opine that Alco's use of a valve (rather than a cap) rendered the Santana main an integral part of Alco's overall distribution system, thus serving a public use.

But Alco's president testified that Alco has *never* opened the valve. Indeed, for operational concerns involving sediment and disinfection, it is against Alco's policy to open the valve. Alco's engineering expert testified the closed valve was designed to function as a simpler and less expensive cap for the Santana main.[2] Owner's engineering expert conceded that "[i]f the gate valve has remained closed all these years, . . . in essence [it] has served as a cap," and the Santana main "serves no customers other than those that are actually on the Santana Apartments parcel."

The Santana main directly feeds the two fire hydrants on the Property. Alco's expert testified that because these hydrants are located in the interior portion of the gated Santana Apartments complex, firefighters would not use the hydrants when fighting fires at neighboring properties. Thus, the hydrants benefit only the Property.

The Santana main also indirectly feeds the Santana Apartments' individual buildings via nine 2-inch service laterals that branch off from the Santana main. All of the ruptures at issue in this case occurred in the 12-inch Santana main, not the 2-inch service laterals.

The Santana Apartments consist of 81 units that house about 400 occupants. However, Alco has only a single customer at the Property: Owner. Alco does not bill the apartment's individual tenants.

### *Ruling*

The trial court found the Santana main does not serve a public use. The court made three key factual findings that brought the case more in line

---

[2]    The alternative was to install an actual cap, which would require installation of a concrete "thrust block" to reinforce the cap against the thousands of pounds of water pressure exerted by the main. Concrete thrust blocks are complex and expensive to install. By contrast, a gate valve simply and inexpensively functions as a cap by using the water pressure from the opposite side of the valve as a thrust block.

5

with the authority on which Alco relied (*Cantu v. Pacific Gas and Electric Co.* (1987) 189 Cal.App.3d 160 (*Cantu*)) than the authority on which Owner relied (*Barham v. Southern Cal. Edison* (1999) 74 Cal.App.4th 744 (*Barham*)).[3] First, the court found it significant that Alco installed the Santana main pursuant to a contract, rather than pursuant to its eminent domain authority.  Second, the court found that although Alco's use of a valve rather than a cap "is arguably a sign that further distribution was intended," the record contained "no evidence that the valve was ever opened," which "supports the conclusion that [Alco] did not use the [Santana] main as a part of its overall distribution system, and did indeed use the valve as a cap." Third, the court consequently found the Santana "main only serviced the residents of the apartment complex and was not designed to deliver water over a greater area."

### *Phase 2*

Instead of proceeding to a phase 2 jury trial on Owner's remaining tort claims, by stipulation the court proceeded to try Alco's fire protection immunity defense, which, if successful, would bar all of Owner's tort claims. The parties further stipulated the court could consider all the evidence that was admitted during the phase 1 trial.  They did not present any new testimony.

The parties filed trial briefs arguing their respective positions on the immunity issue.  Alco argued it was entitled to immunity because instead of adhering to its usual practice of simply bringing a small-diameter pipe to a meter at the property line, Alco entered into a main extension contract with Developer to install a large-diameter main on the Property "specifically . . . as a fire protection main . . . to meet [Developer]'s peculiar fire protection

---

3      We discuss *Cantu* and *Barham* at length in Discussion part I, below.

6

requirements" with respect to the two "privately-owned fire hydrants."  Alco

also cited the fact that its PUC tariff governing water service to the fire

hydrants specifically incorporates the immunity statute.[4]  Alco maintained

the "incidental use of" the Santana main to provide domestic water service to

the Santana Apartments did not preclude immunity.

Owner argued in its trial brief that Alco was not entitled to immunity

because the statute applies only to fire*fighting* (rather than fire *protection*)

equipment and activity.  Further, Alco's main extension contract with

Developer stated in the "<u>PURPOSE OF CONTRACT</u>" section that the

Santana main "will be used for the purpose of furnishing public utility water

service" to the Property.  And although the contract also included a "<u>FIRE

PROTECTION</u>" section setting forth fire hydrant flow requirements, the

PUC's Main Extension Rule No. 15, which was incorporated into the contract,

stated, "Extensions ~~solely~~ <u>primarily</u> for fire hydrant [or] private fire

protection . . . shall not be made under this rule."  Owner maintained these

provisions indicate the Santana main primarily serves the apartment

complex's domestic water needs, rather than a fire protection purpose.

After hearing argument from counsel, the trial court found that fire

protection immunity bars Owner's tort claims.  The court found the Santana

main constitutes fire protection equipment because it "was designed in such a

way to be able to provide adequate water to the hydrants," and "is supplying

water to the hydrants."  The court also found that providing a "compliant

water delivery system to the fire hydrants" was the reason Alco went "beyond

its normal meter service" of delivering water to the property boundary, and

---

4      Publicly regulated utilities must file tariffs with the PUC setting forth
rates and other terms and conditions.  (See *Colich & Sons v. Pacific Bell*
(1988) 198 Cal.App.3d 1225, 1232.)  " 'A public utility's tariffs filed with the
PUC have the force and effect of law.' " (*Ibid.*)

7

instead installed the Santana main *on* the Property. Once there, the Santana main provided domestic water service to the apartment complex merely as a "convenience."

The court entered judgment in Alco's favor.

## DISCUSSION

### I. The Santana Main Does Not Serve a Public Use

Owner contends the trial court erred by finding the Santana main does not serve a public use, thus disposing of Owner's inverse condemnation claim. Owner does not challenge the sufficiency of the evidence supporting the trial court's factual findings regarding the Santana main. Therefore, we review de novo whether those now-undisputed facts establish that the Santana main serves a public use. (*Cantu*, *supra*, 189 Cal.App.3d at p. 163; *Barham*, *supra*, 74 Cal.App.4th at p. 752.) We conclude they do not.

"An inverse condemnation action . . . is an eminent domain action initiated by one whose property was taken or damaged for public use." (*Pacific Bell v. City of San Diego* (2000) 81 Cal.App.4th 596, 601 (*Pacific Bell*); see Cal. Const., art. I, § 19.) "The fundamental policy underlying the concept of inverse condemnation is that the costs of a public improvement benefiting the community should be spread among those benefited rather than allocated to a single member of the community." (*Pacific Bell*, at p. 602; see *Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 558.)

"A successful inverse condemnation claimant must prove that a public entity has taken or damaged its property for a public use." (*Pacific Bell*, *supra*, 81 Cal.App.4th at p. 602; see *San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 939-940.) " 'A public use is "a use which concerns the whole community as distinguished from a particular individual or a particular number of individuals." ' " (*Customer Co. v. City of*

8

*Sacramento* (1995) 10 Cal.4th 368, 381; see *City of Los Angeles v. Superior Court* (2011) 194 Cal.App.4th 210, 221.)

Alco contends *Cantu*, *supra*, 189 Cal.App.3d 160 establishes that the Santana main is *not* a public use, whereas Owner contends *Barham*, *supra*, 74 Cal.App.4th 744 establishes it *is* a public use. We agree with Alco.

In *Cantu*, the developer of a subdivision contracted with a utility company to provide electrical and gas service to the 16 lots within the subdivision. (*Cantu*, *supra*, 189 Cal.App.3d at p. 162.) The utility installed a trench within the subdivision to accommodate its electrical and gas lines. (*Id.* at p. 163.) Years later, during heavy winter rains, a landslide occurred in the subdivision, damaging the plaintiffs' home. (*Ibid.*) The plaintiffs sued the utility for inverse condemnation, alleging the utility's trench was a contributing cause of the landslide. (*Ibid.*) Following a bench trial, the court found the utility liable in inverse condemnation. (*Ibid.*) The Court of Appeal reversed, finding the utility facilities at issue were "for a private use and therefore inverse liability principles are inapplicable." (*Id.* at p. 164.)

The *Cantu* court based its finding of no public use on two key circumstances. (*Cantu*, *supra*, 189 Cal.App.3d at pp. 164-165.) First, the court found it "would be unfair" (*id.* at p. 165) to impose inverse condemnation liability when "service was provided pursuant to a contract between the private developer and [the utility]" rather than by the utility's exercise of its eminent domain authority (*id.* at p. 164). The court reasoned that whereas a utility's acquisition of property by eminent domain reflects "an economic business decision to assume liability in the event damage to neighboring property is proximately caused by its improvement," the "same cannot be said . . . where [an] easement was granted by [a] private developer at no cost to [the utility]." (*Id.* at p. 165.)

9

Second, the *Cantu* court found it significant that the utility trench "was designed to fulfill an individual need" for a single subdivision—it was not part of a larger system "designed to transmit electricity over a much greater area and which would exist even if these particular plaintiffs were not customers." (*Cantu, supra,* 189 Cal.App.3d at pp. 164-165.) Because the utility facilities "did not benefit the public at large but [were] for the private use of the plaintiffs and their neighbors," the court found that imposing inverse condemnation liability would be inconsistent with the doctrine's underlying rationale that "the risks of injury [from public activity] should be spread over society." (*Id.* at p. 165.)

In *Barham*, on which Owner relies, homeowners sued an electrical utility for damage caused to their property by a wildfire that allegedly started when Santa Ana winds caused the utility's overhead power lines to break. (*Barham, supra,* 74 Cal.App.4th at pp. 747-748.) The power lines were part of a "circuit" that "provide[d] electric service to more than 1,000 households." (*Id.* at p. 754.) A jury found in the homeowners' favor on their tort claims, but the trial court, relying heavily on *Cantu*, rejected their inverse condemnation claim. (*Id.* at pp. 747, 754.) The homeowners appealed the latter ruling, and the Court of Appeal reversed. (*Id.* at pp. 747-748.)

In reversing, the *Barham* court distinguished the power lines at issue in its case from the trench at issue in *Cantu*. (*Barham, supra,* 74 Cal.App.4th at p. 754.) Whereas the trench in *Cantu* was "found to have been designed to fulfill an individual need" and thus "was 'unlike the construction of permanent transmission towers or power lines . . . which are designed to transmit electricity over a much greater area,' " those were "precisely the type of facilities" at issue in *Barham*. (*Barham*, at p. 754.) The *Barham* court found inapplicable the *Cantu* court's "public policy" concern about

10

"spread[ing] the cost to the public at large through inverse liability" because the power lines in *Barham* provided "a much greater service to the public at large." (*Barham*, at p. 754.)

Under the facts as found by the trial court, we find *Cantu* dispositive. First, as with the utility company in *Cantu*, Alco installed the Santana main pursuant to a contract with a private developer, rather than through its eminent domain authority. (*Cantu*, *supra*, 189 Cal.App.3d at p. 164.) Thus, Alco did not make the type of "economic business decision" that justifies imposing inverse condemnation liability. (*Id.* at p. 165.)

Second, as with the trench in *Cantu*, the Santana main was "designed to fulfill an individual need." (*Cantu*, *supra*, 189 Cal.App.3d at p. 164.) Alco constructed and maintained a 12-inch main directly on the Property (as opposed to merely delivering water to the Property's boundary) specifically to meet the flow requirements of the fire hydrants, which benefit only the Property. (*Id.* at p. 165 ["the trench was installed specifically to furnish electrical service for plaintiffs and their neighbors"].)

Also as with the trench in *Cantu*, and unlike the power lines in *Barham*, the Santana main does not provide "service to the public at large" (*Barham*, *supra*, 74 Cal.App.4th at p. 754) via facilities "designed to transmit [service] over a much greater area" (*Cantu*, *supra*, 189 Cal.App.3d at p. 164). The trial court expressly found that the gate valve at the end of the Santana main "indeed" functioned as a cap. Under this circumstance, Owner's expert conceded the main "serves no customers other than those that are actually on the Santana Apartments parcel."

Owner emphasizes the possibility that Alco *could* open the valve in the future, in which case the Santana main would serve the public at large. (See, e.g., *Pacific Gas & Electric Co. v. Parachini* (1972) 29 Cal.App.3d 159, 164

11

["In determining" whether "the taking of property is necessary to the public use . . . , the court is entitled to consider not only present needs, but those which can be fairly anticipated on account of future growth."].)  But Alco's president and engineering expert testified it was Alco's policy not to open the valve, that there were operational reasons for not doing so (sediment and disinfection concerns), and that Alco intended the valve to serve as a simpler and less expensive cap.  The trial court reasonably concluded from this testimony—and Alco's 32-year history of never having opened the valve—that Alco did not intend to do so in the future.  (*Id.* at p. 165 ["Whether a use can be 'fairly anticipated' is essentially a factual issue . . . ."].)

Owner also argues that, even assuming the valve serves as a cap, the Santana main nevertheless serves a public use because it serves approximately "400 people" who live in the Santana Apartments, which is "far more than the 16 homes in *Cantu*."  This argument fails for several reasons.  First, it ignores the fact that Alco has only one customer at the Property:  Owner.  Second, it conflates *people* and *homes*—a more apt comparison would be of the Santana Apartments' 81 *units* to *Cantu*'s 16 *homes* and *Barham*'s 1,000 *households*.  When properly framed, the Property is more akin to the subdivision in *Cantu* than the dispersed households in *Barham*.  Finally, the argument ignores the significance of the parties' private contract and the overarching risk-spreading policy considerations underlying inverse condemnation.  (See *Pacific Bell Telephone Co. v. Southern California Edison Co.* (2012) 208 Cal.App.4th 1400, 1406, fn. 4 [noting the importance of the private contract in *Cantu*].)

Owner cites several cases to support the proposition that a finding of public use is determined "not upon the fact of who or how many may be using or may be expected to use the particular service, but rather upon whether use

12

of the service is available to anyone in a position to use it regardless of who he may be." (*Slemons v. Southern California Edison Co.* (1967) 252 Cal.App.2d 1022, 1028; see *Madera Ry. Co. v. Raymond Granite Co.* (1906) 3 Cal.App. 668, 682-683.)  However, whereas *Cantu* is directly on point, none of the cited cases involve issues even remotely similar to the issue before us. (*Slemons*, at p. 1024 [property owners sought to remove utility poles from their property; no inverse condemnation claim, and "[n]o evidence was produced or apparently available to establish the basis upon which the poles and power lines were installed"]; *Madera Ry.*, at pp. 682-683 [addressing whether a railroad company formed by a granite mining company had eminent domain authority to condemn a portion of another mining company's land to build a railroad on which steam trains would transport granite, wood, and cattle, and which "would be an additional convenience *to the neighborhood generally*," italics added]; *Sherman v. Buick* (1867) 32 Cal. 241, 255 [roads connecting residences or farms to a main road are not "private" because "[t]hey are open to every one, who may have occasion to use them, and are therefore public"].)  " 'It is axiomatic that cases are not authority for propositions not considered.' " (*Aixtron, Inc. v. Veeco Instruments Inc.* (2020) 52 Cal.App.5th 360, 386-387.)

In sum, we conclude the Santana main serves "a private use and therefore inverse liability principles are inapplicable." (*Cantu*, *supra*, 189 Cal.App.3d at p. 164.)

## II.  Fire Protection Immunity Applies

Owner also contends the trial court erred in finding section 774's fire protection immunity bars Owner's tort claims.  Based, again, on the trial court's factual findings regarding the nature and purpose of the Santana main, we conclude fire protection immunity applies.

13

Section 774 provides that "[n]o water corporation which has undertaken to provide fire protection service . . . shall be liable for any . . . damage to or loss of property resulting from a failure to provide or maintain . . . any equipment or other fire protection facility or service . . . ."[5] The Legislature enacted this statute in 1972 to provide water companies with the same immunities that the Government Code provides to public entities engaged in fire protection service. (*Valley Title Co. v. San Jose Water Co.* (1997) 57 Cal.App.4th 1490, 1496, 1501 (*Valley Title*); see Gov. Code, §§ 850, 850.2, 850.4.) Immunity for "fail[ing] to . . . *maintain*" fire protection equipment or facilities (§ 774, italics added) includes a water company's failure to "keep [such equipment or facilities] in good repair" (*Valley Title*, at p. 1504).

It is undisputed that Alco is a water corporation within the meaning of section 774. What *is* disputed is whether the Santana main constitutes fire protection equipment such that Alco's construction and maintenance of it constitutes the provision of fire protection service for which Alco is immune. We conclude it does.

The courts have made clear that fire protection immunity applies to water lines and equipment that supply fire hydrants, sprinklers, and other fire protection systems. (*Valley Title*, *supra,* 57 Cal.App.4th at p. 1493 [water pipe connecting distribution main to building's "fire protection system"]; *New*

---

5     Section 774 states in full: "No water corporation which has undertaken to provide fire protection service, nor any employee of such corporation acting in the course and scope of his employment, shall be liable for any death or injury to a person or damage to or loss of property resulting from a failure to provide or maintain an adequate water supply or pressure, or any equipment or other fire protection facility or service; provided, that such immunity from liability shall not exceed that of a public agency or any of its employees, as the case may be, under similar circumstances. Nothing in this section shall preclude the enforcement of any rule, regulation, or order of the [PUC]."

14

*Hampshire Ins. Co. v. City of Madera* (1983) 144 Cal.App.3d 298, 304 ["a valve in a city water system used to furnish water to fight fires is part of the city fire protection 'facilities' "] (*New Hampshire*); *Heieck and Moran v. City of Modesto* (1966) 64 Cal.2d 229, 230-231, 233 [same]; *Lanier Investments v. Department of Water & Power* (1985) 170 Cal.App.3d 1, 8 [same, even where "the malfunctioning water valve was installed on private property pursuant to a 'specific contract' made for the 'specific purpose' of protecting 'specific property' against fire damage"]; *Pacific Bell*, *supra*, 81 Cal.App.4th at p. 602 [cast iron pipe connected to city's distribution system that fed fire hydrant constitutes fire protection equipment; however, immunity did not apply to inverse condemnation claim].)

The courts have also made clear that fire protection immunity applies even when there is no fire or active firefighting. (*Valley Title, supra*, 57 Cal.App.4th at p. 1504 ["section 774 provides immunity from damages resulting from a failure to maintain (or keep in good repair) fire protection facilities or equipment, even where those damages arise from the fire protection equipment itself and not in connection with a fire"]; *Razeto v. City of Oakland* (1979) 88 Cal.App.3d 349, 351, 353 [immunity applied to water

damage caused when vandals opened a fire hydrant when there was no fire].)[6]

What the courts have *not* made clear is the extent to which fire protection immunity applies when—as is the case here—equipment or facilities that serve a fire protection purpose (supplying water to fire hydrants) *also* serve a purpose unrelated to fire protection (supplying domestic water to the apartment complex).

At least one court has implicitly held that fire protection immunity applies to facilities that serve both fire protection and non-fire protection purposes. (See *New Hampshire, supra*, 144 Cal.App.3d 298.) The facility at issue in *New Hampshire* was a city "water valve *located several blocks away*" from a building that burned. (*Id.* at p. 301, italics added.) The court's reference to this several-block distance suggests the court was aware that the valve likely served purposes unrelated to fire protection, yet the court nevertheless found that fire protection immunity applied.

Courts have also held that other immunity statutes apply even when a facility is used both for the purpose specified in the immunity statute and for

---

[6] The cases on which Owner relies to support a contrary conclusion are distinguishable because they involve public entities providing services unrelated to fire protection, which are not subject to fire protection immunity. (See *Varshock v. Department of Forestry & Fire Protection* (2011) 194 Cal.App.4th 635, 649-650 [no immunity for driving a fire engine to the scene of a fire, but immunity for operating it once there]; *Wilson v. County of San Joaquin* (2019) 38 Cal.App.5th 1, 13 [no fire protection immunity for fire department's provision of emergency medical services]; *Lewis v. Mendocino Fire Protection Dist.* (1983) 142 Cal.App.3d 345, 346 [no fire protection immunity for negligently rescuing a camper trapped beneath a fallen tree]; *Vedder v. County of Imperial* (1974) 36 Cal.App.3d 654, 660 [no fire protection immunity for fire caused by city's negligent storage of chemicals on city property without adequate fire protection measures]; *Potter v. City of Oceanside* (1981) 114 Cal.App.3d 564, 565 [no fire protection immunity where fire captain's instructions for addressing a ruptured gas line caused a fire].)

16

other unspecified purposes. (See, e.g., *Loeb v. County of San Diego* (2019) 43 Cal.App.5th 421, 432-434 [recreational "trail immunity" under Gov. Code, § 831.4 applied even though trail was used for both recreational and nonrecreational purposes]; *Burgueno v. Regents of University of California* (2015) 243 Cal.App.4th 1052, 1061 [trail immunity applied to bike path designed and used for commuting, but which was also used for recreation].)

We conclude it is appropriate to apply fire protection immunity to Owner's tort claims because the appellate record establishes that fire protection was a substantial or significant factor in Alco's decision to construct and maintain the Santana main on the Property. Specifically, Alco's president testified that but for the Property's specific fire protection needs, the Santana main would not exist. Instead, in accordance with its usual practice, Alco would have delivered water to the Property's boundary, from which point Developer would have been responsible for installing and maintaining onsite infrastructure. Indeed, this is precisely what Alco did with neighboring apartment complexes. But the Property had a specific fire protection requirement for two fire hydrants. So Alco deviated from its usual practice and installed *on the Property* a 12-inch water main designed to meet the hydrants' flow requirements. Significantly, all the ruptures at issue here occurred in this main, rather than in the service laterals designed to meet the apartment complex's domestic water needs. Because the Santana main would not exist on the Property but for the Property's specific fire protection needs, we conclude section 774 applies, and bars Owner's tort claims.

We are unpersuaded by Owner's contention that certain provisions in the contract between Alco and Developer preclude fire protection immunity. Specifically, Owner cites the fact the contract states the Santana main "will be used for the purpose of furnishing public utility water service," and that

17

the contract incorporates PUC Rule 15, which precludes contracts "<u>primarily</u> for fire hydrant or private fire protection" purposes. But we do not find it necessary that fire protection be the *sole* or even *primary* purpose in order for fire protection immunity to apply to a mixed use facility; it is sufficient that fire protection be a substantial or significant purpose. This is a question of fact, which the trial court resolved in favor of applying immunity. The substantial evidence discussed above supports the trial court's findings in this regard.[7]

Owner argues that granting immunity to Alco under the present circumstances would lead to absurd results, like immunizing a water company if its employee assaulted someone while inspecting a water meter, or incentivizing water companies to pretextually install a single fire hydrant somewhere "remote[]" as a means of immunizing the entire system for delivering contaminated water. These hypotheticals bear no similarity to the facts before us, and ignore that assault remains a crime; property owners can insure against many forms of damage to their property; and section 774 expressly does not "preclude the enforcement of any [PUC] rule, regulation, or order" regarding water quality or public safety. (§ 774.)

In sum, because the facts as found by the trial court establish that fire protection was a substantial or significant factor in Alco constructing and maintaining the Santana main on the Property, we conclude section 744 immunity bars Owner's tort claims.

---

[7] Contrary to Owner's suggestion, no "sleight of hand" arises from the fact that different judges presided over phases 1 and 2. As noted, the parties stipulated that the phase 1 evidence was admissible in phase 2, and the parties discussed this evidence in their phase 2 trial briefs and submitted excerpts of it to the phase 2 judge.

## DISPOSITION

The judgment is affirmed.  Alco is entitled to its costs on appeal.


HALLER, Acting P. J.

WE CONCUR:


DATO, J.


GUERRERO, J.

19

Filed 12/9/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| FOLEY INVESTMENTS, L.P.,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>ALISAL WATER CORPORATION,<br><br>    Defendant and Respondent. | D079045<br><br>(Super. Ct. No. 17CV002074)<br><br><br>ORDER CERTIFYING<br>OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed November 16, 2021, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the requests pursuant to rule 8.1120(a) for publication are GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

HALLER, Acting P. J.

Copies to: All parties